UNITED STATES of America,

v.

**Howard L. CRIDEN, Harry P. Jannotti, Louis C. Johanson, George X. Schwartz.**

**Crim. No. 80–166.**

United States District Court,
E. D. Pennsylvania.

Oct. 22, 1980.

James J. Rohn, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Richard Ben–Veniste, Washington, D. C., for defendant Criden.

J. Clayton Undercofler, III, Philadelphia, Pa., for defendant Jannotti.

John Duffy, Philadelphia, Pa., for defendant Johanson.

Richard A. Sprague, Pamela W. Higgins, Philadelphia, Pa., for defendant Schwartz.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

National Broadcasting Company, Inc., American Broadcasting Companies, Inc., CBS, Inc., and Westinghouse Broadcasting Company, Inc. (hereinafter referred to as "the broadcasters") have renewed their application "for permission to copy, for the purpose of broadcasting to the public, those video and audio tapes admitted into evidence and played to the jury in open court in this action."

At the trial of the defendants Schwartz and Jannotti, the Government introduced evidence in the form of video tapes of meetings between the defendants and undercover F.B.I. agents posing as representatives of fictitious wealthy mideastern businessmen, and audio tapes of telephone conversations between the defendant Criden and the undercover agents and a government informant. All of this evidence was obtained through surreptitious surveillance, without the knowledge or consent of the participating defendants.

The defendants Schwartz and Jannotti were convicted, and their post–trial motions are pending before this Court. The cases of the defendants Criden and Johanson were severed, and they are awaiting trial.

The defendants Criden and Johanson are also named as defendants in various indictments pending in the Eastern District of New York, arising from the same investigation, generally referred to as the Abscam investigation, giving rise to the present cases. Trial on one of those indictments, in which United States Congressman Michael Myers and Camden, New Jersey, Mayor Angelo Errichetti are also defendants, commenced in the Eastern District of New York in August of this year, and resulted in convictions of all of the defendants. Their post--trial motions are pending before the District Court. (For convenience, that case will be referred to herein as "the Myers trial"). Much of the Government's evidence in that trial consisted of similar video tapes of meetings and audio tapes of conversations.

In the course of the Myers trial, the broadcasters sought permission to make copies of the videotapes presented to the jury. It was established that this could readily be accomplished unobtrusively as the tapes were being played before the jury, without alteration of or damage to the originals. In a ruling from the Bench, the trial judge granted the request, but directed that the copying be performed only during recesses in the trial, rather than simultaneously with the presentation of the evidence. The defendants appealed that ruling to the Court of Appeals for the Second Circuit, and obtained a temporary stay of the order. The Court of Appeals expedited its consideration of the matter, combining the hearing on the continuation of the stay with the hearing on the merits, but the Myers trial had ended when the Court of Appeals, on October 1, 1980, rendered its decision affirming the order of the trial

judge. On October 14, 1980, the Supreme Court declined to grant a stay of the order.

At the start of the Schwartz–Jannotti trial in this Court, on September 8, 1980, the broadcasters initially sought the same relief they now seek. The application was denied, in a bench ruling. Among the reasons expressed at that time were the pendency of the appeal before the Second Circuit; the fact that Criden and Johanson faced trial on this Indictment at a later date, and none of the trials of the defendants on this Indictment had been concluded; and the pendency of non–frivolous challenges to the Indictments on due process grounds. In renewing their application at this time, the broadcasters point out that the tapes they now seek were offered in evidence at the trial of Schwartz and Jannotti which has now been completed, the Second Circuit has upheld the order of the trial judge releasing the tapes in the *Myers* case, the Supreme Court refused to stay those orders, and the tapes from the Myers trial have now been copied and extensively broadcast.[1]

I agree that these intervening developments necessitate a re–examination of the issues raised by the broadcasters' applications.

### I.

In *U. S. v. Myers, et al., In re Application of National Broadcasting Company, Inc., et al.*, 635 F.2d 945 (2d Cir. 1980), the court upheld the release of the tapes to the broadcasters upon essentially the following rationale: The broadcasters, like other members of the public, have a very important common law right to inspect and copy judicial records; while this right is not absolute, there is a strong presumption in favor of such public access to judicial records; and only the most compelling reasons can justify curtailment of that right. The court stated:

"... there is a presumption in favor of public inspection and copying of any item entered into evidence at a public session of a trial. Once the evidence has become known to the members of the public, including representatives of the press, through their attendance at a public session of court, it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction." (At p. ——.)

The court held that the presumption had not been overcome in this case, and that the possibility of impairing the Sixth Amendment rights of defendants not yet tried, and of defendants whose convictions were not yet final, were too speculative to justify non–disclosure; and that such interests could be accommodated in other ways.

The court found support for its holding in the decision of the Court of Appeals for the District of Columbia Circuit in the Watergate Tapes litigation, *U. S. v. Mitchell*, 551 F.2d 1252 (D.C.Cir. 1976), *rev'd sub. nom. Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), and in the Opinion of the Supreme Court in the Watergate litigation, *Nixon v. Warner Communications, supra.*

The decision of a circuit court of appeals which is squarely apposite is entitled to the utmost respect, notwithstanding the fact that it emanates from another circuit, and is therefore not totally binding upon this Court. This is particularly true when the decision is rendered in litigation so closely related to the case under consideration. After carefully considering this matter, however, and with all deference to the views of the Second Circuit Court of Appeals, I find myself in total disagreement with the *Myers* decision, which I believe to be contrary to the views of the Supreme

---

**1.** After the conclusion of the Schwartz–Jannotti trial, this Court permitted copies of the video tapes of their meetings with the F.B.I. undercover agents to be viewed by members of the Philadelphia City Council in closed session, in recognition of the importance of that evidence to matters currently under consideration by City Council.

Court as expressed in the *Warner Communications* case, *supra*.[2]

The seeming temerity of declining to follow the Second Circuit's lead is tempered by the observation that, as plainly recognized by the Supreme Court, the decision as to access to trial evidence is committed to the discretion of the trial court. Thus, the Second Circuit's decision, in the final analysis, was that the trial court in the *Myers* case had not abused his discretion by releasing the tapes; it does not necessarily mean that a contrary decision by the trial court would have been reversed by the Second Circuit. It ought not to be surprising that matters committed to the discretion of trial courts may produce differing results.

In *Nixon v. Warner Communications, Inc., supra*, the Supreme Court held: "That the common law right of access to judicial records does not authorize release of the tapes in question from the custody of the district court" (435 U.S. at p. 608, 98 S.Ct. at p. 1317); that release of the tapes in that case was not required by the First Amendment guarantee of freedom of the press (*id.*, at pp. 608–610, 98 S.Ct., at pp. 1317–1318); and that release of the tapes was not required by the Sixth Amendment guarantee of a public trial (*id.*, at p. 610, 98 S.Ct., at p. 1318). All of the factors which eliminated constitutional issues in that case are present here. The trial was public, the tapes were viewed and heard by all in attendance at the trial, and representatives of the media had the same access to the evidence as anyone else (indeed, media representatives had greater access, in that they were furnished transcripts of the tapes). Thus, only issues related to the asserted common law right of access are implicated in the present decision. And it is correspondingly important to focus upon what the Supreme Court said about those issues.

Speaking for the Court, Mr. Justice Powell stated:

"Both petitioner and respondents acknowledge the existence of a common law right of access to judicial records, but they differ sharply over its scope and the circumstances warranting restrictions of it. An infrequent subject of litigation, its contours have not been delineated with any precision...

"It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice [citation omitted], American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit. The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies [citations omitted] and in a newspaper publisher's intention to publish information concerning the operation of government [citation omitted].

"It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common law right of inspection has bowed before the power of a court to ensure that its records are not 'used to gratify private spite or promote public scandal' through the publication of 'the painful and sometimes disgusting details of a divorce case' [citations omitted]. Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption [citations omitted], or as sources of business information that might harm a litigant's competitive standing [citations omitted].

"It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common law right of access or to

---

**2.** The Supreme Court's denial of a stay in the *Myers* case does not, of course, constitute a ruling on the merits.

identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case. In any event, we need not undertake to delineate precisely the contours of the common law right, as we assume, *arguendo*, that it applies to the tapes at issue here." (435 U.S. at pp. 597–99, 98 S.Ct. at pp. 1311–12.) [Footnotes omitted.]

The Court then proceeded to review the contentions of the parties, and stated:

"At this point, we normally would be faced with the task of weighing the interests advanced by the parties in light of the public interest and the duty of the courts. On respondents' side of the scales is the incremental gain in public understanding of an immensely important historical occurrence that arguably would flow from the release of aural copies of these tapes, a gain said to be not inconsequential despite the already widespread dissemination of printed transcripts. Also on respondents' side is the presumption—however gauged—in favor of public access to judicial records. On petitioner's side are the arguments identified above, which must be assessed in the context of court custody of the tapes. Underlying each of petitioner's arguments is the crucial fact that respondents require a court's cooperation in furthering their commercial plans. The court—as custodian of tapes obtained by subpoena over the opposition of a sitting president, solely to satisfy 'fundamental demands of due process of law and the fair administration of criminal justice' [citation omitted]—has a responsibility to exercise an informed discretion as to the release of the tapes, with a sensitive appreciation of the circumstances that led to their production. This responsibility does not permit copying upon demand. Otherwise, there would exist a danger that the court could become a partner in the use of subpoenaed materials 'to gratify private spite or promote public scandal' [citation omitted] with no corresponding assurance of public benefit.

"We need not decide how the balance would be struck if the case were resolved only on the basis of the facts and arguments reviewed above. There is in this case an additional, unique element that was neither advanced by the parties nor given appropriate consideration by the courts below. In the Presidential Recordings Act, Congress directed the administrator of General Services to take custody of petitioner's Presidential tapes and documents...." (At pp. 602–603, 98 S.Ct. at pp. 1314–1315.)

"... because of this Congressionally prescribed avenue of public access we need not weigh the parties' competing arguments as though the district court were the only potential source of information regarding these historical materials. The presence of an alternative means of public access tips the scales in favor of denying release." (At pp. 605–606, 98 S.Ct. at p. 1316.)

To recapitulate, the Supreme Court held:

1. The interest of the public in a public trial, as guaranteed by the Sixth Amendment, is fully vindicated when the public is permitted to attend, and when representatives of the news media are accorded the unfettered right to be present and to convey to the general public *information about* what occurred at trial. The Sixth Amendment does not guarantee to the general public an absolute right to participate in the trial through attendance (this right is, of course, qualified by limitations of space and feasibility), nor does it guarantee, or even necessarily encourage, the realization of an expectation that the actual experiences of the trial - the sights and sounds of the witnesses, the perusal of trial exhibits—will be shared by the public at large to the maximum possible extent. (If the law were otherwise, I suggest, the trial of a sensational or otherwise newsworthy case should be held in Veterans Stadium. But the mass–spectacle or "show trial" is totally antithetical to our concept of justice.)

2. The First Amendment rights of the news media are fully vindicated when representatives of the media have the unfettered right to attend the trial and to report fully what occurred there.

3. The absence of a constitutional basis for permitting copying and broadcasting of trial evidence does not mean that there is no such right. On the contrary, the common law right of access to public documents and related materials antedates, and exists independently of, the constitutional provisions. However, this common law right has not been defined with precision. It probably includes the right to copy all forms of trial evidence; at least, the Supreme Court was willing to assume so, *arguendo*. The court in which the trial evidence was introduced has control over that evidence; decisions concerning access to and copying of such material rest within the sound discretion of the trial court. In exercising its discretion, the trial court must carefully consider, and give appropriate weight to, the competing interests involved. However, in the Watergate litigation, it was unnecessary to engage in that weighing process to any great extent, because, in the interim, Congress had provided an administrative mechanism through which access to the evidentiary materials might ultimately be obtained, from sources other than the trial court.

I find it quite impossible to derive from the Supreme Court's decision any support for the expansive view of the common law right of access espoused by the Second Circuit and the D. C. Circuit Court of Appeals, namely, that there is a very strong presumption in favor of permitting copying and re–dissemination by the broadcasters, and that only the most extraordinary circumstances imaginable could justify a contrary decision. It is true that, in summarizing the competing considerations, the Supreme Court referred to "the presumption-- however gauged–in favor of public access to judicial records" (in itself, a far cry from

declaring a strong presumption in that direction); but this language is immediately followed by the Court's recognition of "the crucial fact that [the broadcasters] require a court's cooperation in furthering their commercial plans." And the Court stated flatly that the trial court "has a responsibility to exercise an informed discretion as to the release of the tapes, with a sensitive appreciation of the circumstances that led to their production. This responsibility does not permit copying upon demand."

One searches the Supreme Court's Opinion in vain for any suggestion that only the most extraordinary circumstances would warrant denial of the right to copy and disseminate trial evidence. Indeed, the examples cited by the Court, in which curtailment of the right of access was upheld, could scarcely be characterized as extraordinary: the messy divorce case, potentially libelous statements, information detrimental to a business enterprise.

It should be noted, also, that the reasoning of the D.C. Circuit, adopted by the Second Circuit, in support of the alleged strong presumption, invoked the very concepts of the public's interest in a public trial which the Supreme Court held were *not* involved in its consideration of the matter.[3]

For these reasons, I am not at all persuaded that the presumption in favor of disclosure is as powerful as the *Myers* decision indicates. But whatever the force of the presumption, I am also convinced that the circumstances of the present case are indeed sufficiently extraordinary to require denial of the broadcasters' application.

## II.

■ The first point to be emphasized, in attempting to achieve a correct exercise of the Court's discretion in this case, is the very great difference between videotape evidence and other forms of evidence. The hackneyed expression, "one picture is worth a thousand words" fails to convey adequately the comparison between the impact of

---

3. It is also important to note that the convictions of the defendants in the Watergate cases were final when the tapes issues were decided by the appellate courts, a distinction virtually ignored by the *Myers* court.

the televised portrayal of actual events upon the viewer of the videotape and that of the spoken or written word upon the listener or reader. The viewer of videotape becomes virtually a participant in the events portrayed. Eyewitness testimony is often dramatic and convincing, but its effectiveness and convincing power are almost negligible in comparison with a film or videotape of actual events. When the videotape shows a crime actually being committed, it simply leaves nothing more to be said.

This is all to the good, when the videotape is presented in evidence in the course of a trial: The jury is plainly entitled to the best and most reliable evidence available, in its quest for the truth. If the truth is shocking, if the evidence is powerfully convincing, so be it; the accused has no justifiable complaint.

But dissemination of powerfully convincing evidence beyond the confines of the trial arena can, in some circumstances, cause serious and irreparable harm, both to persons whose interests are entitled to protection, and to the judicial process itself.

Until this point in our history, it has been generally accepted that the impact of our criminal justice system upon persons whose activities subject them to criminal charges comes about approximately as follows: the community becomes aware of the accusation; the defendant and his family and friends undergo whatever embarrassment and unpleasantness that may entail; the defendant faces the rigors and uncertainties of a trial; if the defendant is found guilty, the community is made aware of that fact; the criminal sanctions provided by law are imposed; at the conclusion of the process, the defendant will have "paid his debt to society" and, it is to be hoped, will have achieved rehabilitation. That the entire process causes anguish, and even severe hardship, to innocent third persons is often unavoidable, but such unfortunate consequences are not an intended purpose of the process.

The greater and more widespread the publicity about a particular criminal case, the more likely it is that penalties not prescribed by the law will be visited upon the accused and, more importantly, upon innocent relatives and friends. Similarly, the greater the publicity, the greater the risk of infringement of the defendant's right to a fair trial.

Given the nature of our society these side effects are inevitable; indeed, it can be argued that they form an important, if unofficial, part of the sanctions imposed by society upon lawbreakers. The unfortunate fact is, however, that these side effects are not uniformly visited upon persons accused of violating the law. And, since they are not an official part of the criminal justice process, and are beyond the reach of that process, there is probably no acceptable way of ensuring uniformity of application.

It is, however, one thing to say that these disparate side effects are independent of the law and beyond the reach of the courts, and quite a different thing to suggest that courts may, with propriety, actively intervene to bring them about, in particular cases.

In its present stage of development, our law surely would not tolerate parading a convicted defendant through the streets, or holding him up to public ridicule by exhibiting him in a cage or in the stocks. The balance between the public interest in free access to news, and the law's regard for the dignity of every human being, is achieved when the public is informed concerning the events at trial, and concerning the punishment inflicted by the law. That balance would be destroyed by intentionally creating a situation in which the defendant's initial misconduct is graphically portrayed in every living room in America.

It is one thing to say that, in a highly publicized trial, the defendant's right to trial before an impartial jury of his peers may have to be limited by the necessity of relying upon the integrity of the prospective jurors, and the accuracy of their professions of ability to disregard unfavorable publicity and to base their verdict solely upon the evidence presented at trial. It is quite another thing to suggest that courts can, with

propriety, intentionally create, or vastly increase the dissemination of, unfavorable publicity. Stated otherwise, courts may have to cope with difficulties not of their own making, in assuring a defendant his right to a fair trial, but that does not mean that courts can actively create such difficulties without doing violence to the Sixth Amendment.

The convictions of Schwartz and Jannotti are not yet final. At this stage, it would be presumptuous to suggest that, no matter what disposition is made by this Court of their post–trial motions, the possibility of a retrial is purely speculative. The tapes which were used at the Schwartz and Jannotti trial also show the defendants Johanson and Criden, whose initial trials in this district have not yet taken place. Notwithstanding the vast amount of publicity which has already been accorded this case, there remains a possibility that an untainted jury may yet be obtainable. But *see Rideau v. Louisiana,* 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). For example, while virtually all of the prospective jurors called in the Schwartz and Jannotti case had heard or read about the case, most were able to state, truthfully in my view, that their awareness of the case was somewhat vague, and that they had formed no lasting conclusions concerning the guilt or innocence of the defendants. Because of the heightened publicity which would attend broadcasting of the actual tapes, and because of the vastly enhanced impact of the tapes themselves, I believe it is much less likely that a truly impartial jury could be obtained for the Criden and Johanson trials, or for possible retrials of Schwartz and Jannotti, if disclosure were permitted at this time. *See Rideau v. Louisiana, supra.*

The alternatives usually suggested for dealing with this problem would, I believe, be ineffectual. Delay of the trial would not solve the problem, since the broadcasters can undoubtedly be relied upon to re–play the tapes as part of their advance coverage of such trials. A change of venue would be of dubious value, given the nationwide dissemination of the tapes.[4]

Because release of the tapes at this time would seriously jeopardize the fair trial rights of the defendants, and because quite apart from that problem, respect for due process of law mandates that a court may not take any action which amounts to the imposition of punishment except upon final conviction, I have concluded that the tapes should not now be released to the broadcasters.

### III.

Denial of the present application is also justified for additional reasons, arising from the peculiar circumstances of this particular case, and the precise nature of the videotape evidence. In the *Myers* case in the Second Circuit, it was assumed, and the preceding discussion in this case has assumed, that all of the videotape evidence sought by the broadcasters was properly admitted in evidence at the trial. Whatever may be the validity of that assumption with respect to the Myers litigation,[5] the admissibility of the videotapes was sharply contested at the Schwartz -Jannotti trial. I ruled that the evidence was admissible; but not only will the correctness of that ruling be subject to further challenge on appeal, but the very basis upon which I concluded that the tapes were admissible in evidence points up the inadvisability of releasing the tapes for broadcast at this time.

Surreptitiously obtained recordings of conversations would ordinarily not be admissible in evidence. They become admissible only where one of the parties to

---

4. Pertinent excerpts from the tapes of the Myers trial have been repeatedly played during network news programs; the public television network has devoted several hours of prime viewing time to playing the tapes in their entirety, with a running commentary. The tapes have been the subject of nationally televised discussion programs.

5. Apparently, there was no objection to the evidence at the *Myers* trial, except to the extent that such an objection may be implicit in the broader due process challenge, which is to be resolved post -trial.

the conversation has consented to the recording. The law takes the position that, except in situations covered by a recognized privilege, when A has a conversation with B, neither party can be sure that the other will not disclose what was said. Therefore, if A has no reasonable expectation of privacy with respect to the contents of his conversation with B, the fact that B records the conversation merely ensures accuracy, and violates no right of A. *See, e. g., U. S. v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

In the case of videotape, however, a new dimension is added. The fact that A has no reasonable expectation of privacy with regard to what he says to B does not necessarily mean that he has no expectation of privacy with respect to his appearance, demeanor, or actions, in the course of the conversation. To refine the matter still further, it can perhaps be stated that A has no reasonable expectation that B will not *describe* to others how A looked and what he did during the conversation; but B's description does not emanate from A; moreover, its impact is of a different order of magnitude than the actual sight of A throughout the conversation.

In the relatively small percentage of cases in which videotape evidence of actual events is presented (as distinguished from videotaped testimony of witnesses), the taped or filmed events generally occur in public places. Since no one has any reasonable expectation of privacy with respect to his appearance and actions in a public place, there is no obstacle to admissibility of the tape.

■ The present cases are unique in that the videotaped transactions occurred in a private place, namely, a hotel room. In ruling the tapes, with certain exceptions which will be mentioned below, admissible in evidence, I took the position that the sound portions of the tapes, which recorded the conversations between the participants, were admissible because the recording had been consented to by one of the participants. I did not interpret any of the objections raised at trial as suggesting that only

the sound should have been played to the jury; moreover, the conduct of the participants in the course of their actual conversations could properly be regarded as a form of speech. There was also the argument, advanced by the Government, that an expectation of privacy with respect to occurrences in a hotel room arises only on the part of the person registered in that room; as to visitors, it was argued, there is no expectation of privacy. While I continue to believe that the rulings were correct, the issue is certainly not free from doubt.

More importantly, it was necessary at trial to excise certain portions of the taped conversations, namely, those conversations which occurred when no representative of the Government was present in the room. As to such portions of the conversation, no participant had consented to the recording.

In my view, several portions of the videotape deemed admissible at the Schwartz–Jannotti trial would not be admissible in the Criden trial. I refer in particular to the periods when Criden was alone in the room. The videotape showing Mr. Criden snooping through the contents of the undercover agent's briefcase did no harm at the Schwartz Jannotti trial, but would be devastatingly prejudicial as evidence against Criden, notwithstanding its marginal relevance.

It should be noted that the audiotapes involved in the Watergate litigation were concededly admissible in evidence, and that the Second Circuit in the *Myers* case stressed the absence of objection to the evidence at trial. Both the Second Circuit and the D. C. Circuit intimated that the result might be different if there were substantial doubt as to the admissibility of the evidence sought to be copied and broadcast, and the same view is reflected in the Supreme Court's Opinion in *Warner Communications, supra.*

Another feature of the evidence in the present case which distinguishes it from the cited cases is that the tapes now under consideration are replete with scurrilous and libelous statements about third parties. I simply do not believe that a court should

condone, much less affirmatively aid, the large–scale republication of such material.

The pendency of non–frivolous challenges to the entire prosecution as a violation of due process of law–an issue soon to be resolved in this Court but certain to be subject to appellate review–is a further factor militating against premature dissemination of the trial evidence, as is the defendants' related assertion that the tapes are misleading because they reveal only part of the story.

### IV.

■ Finally, I suggest that the broadcasting of videotape evidence is virtually indistinguishable from televising the trial itself. Yet the televising or other broadcasting of trial proceedings in the federal courts is expressly prohibited by resolution of the Judicial Conference of the United States, most recently reiterated at the September 1980 meeting of that body. This Court is not at liberty to disregard that injunction, merely because broadcasting can be accomplished unobtrusively.

Moreover, it is not at all clear that the sole concern of the Judicial Conference is with maintaining courtroom decorum or avoiding distracting influences. Also implicated are much larger questions concerning the fundamental changes in our society wrought by technological advances in instant communication. That the marvels of the electronic age are highly beneficial should not obscure their potential for devastating encroachment upon traditional concepts of individual dignity, generally, though in my view inadequately, described as the right of privacy. Governmental intrusions upon the privacy of individuals embroiled in or affected by criminal prosecutions may be more readily acceptable when the result is the dissemination of information to a public which is limited either geographically or by interest in the subject matter, than when the result is dissemination of videotapes to a national or even worldwide public. There is, I believe, 'a growing public awareness that when a person becomes a totally public figure, whether through choice or involuntarily, there are trade–offs which benefit neither the public, its institutions, nor the individual.

Awareness that one is being viewed by spectators in a courtroom may not have entirely the same consequences as awareness that one is being viewed by millions of people. That difference, for witnesses, jurors, counsel and judges, may affect the integrity of the trial process, but that question is not necessarily the only concern; the greater intrusion upon privacy interests, including those of the defendant and his family, must also be considered. The Supreme Court will have occasion to address these larger issues in cases now pending for review, and it is neither necessary nor appropriate for this Court to venture further into the free press fair trial privacy thicket. I am, however, bound to comply with the Judicial Conference resolution. And, in my view, copying videotape evidence for public broadcast is sufficiently different from copying documentary evidence, and sufficiently analagous to permitting broadcasting of the trial itself, to warrant the conclusion that granting the broadcasters' application in this case would be contrary to that resolution.

### V.

For all of the reasons discussed above, the application of the broadcasters will be denied.