UNITED STATES of America

v.

MARTIN, James.

Appeal of PHILADELPHIA NEWSPAPERS, INC., Westinghouse Broadcasting and Cable, Inc., and CBS Inc.

No. 84–1469.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
Sept. 11, 1984.

Decided Oct. 19, 1984.

As Amended Oct. 23, 1984.

Sloviter, Circuit Judge, filed a dissenting opinion.

Katherine Hatton, Samuel E. Klein, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., Gregory M. Harvey, Frank L. Corrado, Morgan, Lewis & Bockius, Edward W. Mullinix, James D. Crawford, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellants.

John J. Swaim, Philadelphia, Pa., for appellee.

Michael S. Durst, Mozenter, Molloy & Durst, Philadelphia, Pa., for Fraternal Order of Police, Lodge No. 5, amicus curiae.

Before SEITZ, HIGGINBOTHAM and SLOVITER, Circuit Judge.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This is an appeal from an order of the district court denying Philadelphia Newspapers, Inc., Westinghouse Broadcasting and Cable, Inc., and CBS, Inc. ("appellants") permission to copy audiotapes admitted into evidence at the trial of seven former Philadelphia police officers. The district court also denied appellants access to transcripts of the tape recordings that had been given to the jury. Applying the principles established in *United States v. Criden*, 648 F.2d 814 (3d Cir.1981), the district judge determined that he had "no reasonable alternative to this course of action." Bench Opinion at 12A. For the reasons set forth below, we will reverse the order of the district court.

## I.

On May 3, 1984 fifteen officers and former officers of the Philadelphia Police Department were indicted on charges stemming from an alleged city-wide practice of extorting protection money from operators of illegal video poker machines and "numbers" lotteries. The indictment charged each defendant with conspiracy, racketeering, and multiple counts of extortion. In addition, the indictment charged James Martin, then the Deputy Commissioner of the Philadelphia Police Department, with three counts of obstructing a criminal investigation through the payment of "hush money" to Albert Ricci, a Philadelphia police officer who was named as a defendant in an initial indictment handed down in March, but who later pleaded guilty and agreed to testify for the government. Martin and Joseph DePeri, a Chief Inspector at the time of the indictment, were also charged with obstructing justice by destroying records relating to payoffs made by video poker machine vendors. The trial of Martin, DePeri and five other defendants ended on August 10, 1984 with verdicts of guilty on all counts. The trial of the eight remaining defendants is scheduled to begin on November 5, 1984.

The government's case, which included the testimony of Albert Ricci and numerous victims of the alleged extortion conspiracy, centered on former Lieutenant Joseph Alvaro. Alvaro resigned from the force and agreed to cooperate with the FBI in exchange for immunity after his name surfaced in the ongoing federal investigation of corruption in the Philadelphia Police Department. In addition to Alvaro's in-court testimony, the jury heard tape recordings of face-to-face and telephone conversations between Alvaro and—principally—Martin, DePeri, and Ricci. While jurors were provided with headsets and transcripts to aid them in following the conversations, courtroom spectators could only listen to the tapes over the loudspeakers.[1] Appellants, owners of two local newspapers and three broadcast stations, promptly moved for permission to copy the audiotapes and for access to the transcripts, for the purpose of disseminating these materials to the public. They now appeal from the district court's denial of their motions. Counsel for one of the remaining eight defendants entered an appearance as an appellee, but deferred to the Fraternal Order of Police, which filed a

---

1. Because courtroom spectators had difficulty hearing the first tape played over the loudspeaker, the district judge permitted representatives of the media to examine a transcript of it during a luncheon recess.

brief as *amicus curiae*. We granted appellants' petition for expedited consideration.

## II.

Appellants contend that the district court misapplied the principles of *United States v. Criden*, 648 F.2d 814 (3d Cir.1981) (hereinafter cited as *Criden I*)[2] in denying their request for access to the tape recordings and transcripts. Thus, our analysis must begin with a brief review of that case.

*Criden I* arose out of the FBI undercover operation popularly known as "Abscam". George X. Schwartz, then President of the Philadelphia City Council, Harry P. Jannotti and Louis C. Johanson, Philadelphia City Council members, and Howard L. Criden, a Philadelphia attorney, were indicted on charges of bribery and related offenses. At the trial of Schwartz and Jannotti, which the district court had severed from the other cases, video and audiotapes made by the FBI were prominent items of proof. The district court released transcripts of the tapes, but denied the three major networks and a local broadcaster permission to copy the tapes for rebroadcast to the public.

On appeal we acknowledged that release of the tapes was a matter committed to the discretion of the district court, but we explained that the exact scope of review of a discretionary matter is dependent on "the reason why that category or type of decision is committed to the trial court's discretion in the first instance." 648 F.2d at 817. We went on to say:

In the matter before us on this appeal, the decision whether to release the tapes was not dependent in the main on particular observations of the trial court. Therefore, the trial court's decision is not accorded the narrow review reserved for discretionary decisions based on firsthand observations, and we must consider both the relevance and weight of the factors considered....

We note that until or unless guiding rules have become fixed, it is important that the exercise of discretion be accompanied by the trial court's articulation of the factors considered and the weight accorded to them, ....

648 F.2d at 818–19.

Applying this standard of review, we reversed the order of the district court in *Criden I*. We found that the district court had given too little weight to the common law right of the public to inspect and copy judicial records, *see Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), and "the significant interest of the public in observation, participation, and comment on the trial events," 648 F.2d at 823. We held that these two factors together created "a strong presumption that material introduced into evidence at trial should be made reasonably accessible in a manner suitable for copying and broader dissemination."[3] *Id.* Of the factors the district court cited as militating against release, we dismissed some as irrelevant or entitled to little weight,[4] and concluded that others could be addressed by

---

**2.** *Criden I* remanded the matter to the district court for determination of whether dissemination of the requested materials was likely to cause such serious harm to third parties as to merit excision of certain portions. On remand the district court deleted *all* references to third parties. The media applicants again appealed, and our decision ordering more selective excision is reported as *United States v. Criden*, 681 F.2d 919 (3d Cir.1982) (*Criden II*). Our dissenting colleague, Judge Sloviter, authored the opinions in both *Criden I* and *Criden II*.

**3.** We did not consider in *Criden I* whether the public has any right to these materials based on the first amendment, 648 F.2d at 820, 821 n. 6,

and in view of our disposition of this case on nonconstitutional grounds we will intimate no view on that question now.

**4.** These factors were the special impact of videotape evidence, 648 F.2d at 823–24; the "enhanced punishment" the defendants would suffer as a result of rebroadcast, 648 F.2d at 824–26; concern that the requested tapes had been improperly admitted into evidence, 648 F.2d at 828; concern that some of the material would be highly prejudicial to a subsequent defendant though inadmissible at his trial, *id.;* and fear that release of videotapes, like televising the trial itself, could disrupt the trial process, 648 F.2d at 828–29.

means short of withholding the tapes wholesale.[5]

Here the district court has stated three reasons for its decision to deny access: (1) the transcripts sought by appellants were not admitted into evidence (Bench Opinion at 4–5); (2) the public interest in these proceedings is not as significant as the interest in Abscam (Bench Opinion at 7–8); and (3) the "enhanced publicity" caused by release of the requested materials would likely make it impossible to impanel a fair and impartial jury for the trial of the eight remaining defendants (Bench Opinion at 11). As we did in *Criden I,* "[w]e must consider both the relevance and weight of the factors considered." 648 F.2d at 818. We do so with the added guidance of the legal rules that emerged in *Criden I.*

### 1. *Access to Materials Not Admitted Into Evidence*

■ The first consideration the district court mentioned in denying appellants' request was the fact that the transcripts provided to the jury were not admitted into evidence. "Thus," the district court concluded, "any common law right to access to evidence introduced at trial should not apply to tape transcripts." Bench Opinion at 5. We believe that the district court's view of the common law right is too narrow, and that the strong presumption in favor of access established in *Criden I* applies to these transcripts.

It is true, as the district court noted, that our holding in *Criden I* extended only to "material introduced into evidence at trial...." 648 F.2d at 823. In that case, however, the district court *did* release tran-

scripts of the video and audiotapes to the public, 648 F.2d at 822, and the appeal raised only the issue of permission to copy and rebroadcast the evidence itself.[6] Thus, we had no occasion to consider whether the strong presumption in favor of access applied to judicial records and documents other than evidence. That issue is now squarely before us.

■ The strong presumption established in *Criden I* was based on two factors: the common law right of access to judicial records, and the public interest in "observation, participation, and comment ...." 648 F.2d at 823. We find that both of these factors support a strong presumption in favor of access to these transcripts. The common law right of access is not limited to evidence, but rather encompasses all "judicial records and documents," *Warner Communications,* 435 U.S. at 597, 98 S.Ct. at 1311–1312. It includes "transcripts, evidence, pleadings, and other materials submitted by litigants ...." Comment, *All Courts Shall Be Open: The Public's Right to View Judicial Proceedings,* 52 Temple L.Q. 311, 337–38 (1979). The public interest in monitoring judicial proceedings[7] also supports a presumption in favor of access. Although representatives of the media were present at the trial and were able to take notes on the recorded conversations as they were played to the jury, this procedure has obvious limitations. The public interest can best be vindicated by the release of complete and accurate transcriptions, at the expense of the media applicants. We therefore hold that the strong presumption in favor of public access ap-

---

5. We held that the use of *voir dire,* rather than withholding the tapes, would adequately protect the fair trial rights of defendants in subsequent related proceedings, 648 F.2d at 826–28, and that the privacy interests of third parties could be protected by selective excision of material likely to cause third parties severe harm, 648 F.2d at 829.

6. Indeed, this appears to be true generally in cases involving requests by the media to copy video or audiotapes used as evidence. *See, e.g., Nixon v. Warner Communications,* 435 U.S. 589, 594, 98 S.Ct. 1306, 1310, 55 L.Ed.2d 570 (1978);

*United States v. Edwards,* 672 F.2d 1289, 1291 (7th Cir.1982); *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423, 427 (5th Cir.1981); *In re Application of National Broadcasting Co.,* 653 F.2d 609, 611 (D.C.Cir.1981); *In re Application of National Broadcasting Co. (United States v. Myers),* 635 F.2d 945, 952 (2d Cir.1980). *See generally* Note, *Access to Taped Evidence: Bringing the Picture into Focus,* 71 Geo.L.J. 193 (1982).

7. We recently discussed this interest in detail in the context of a civil proceeding. *See Publicker Indus. v. Cohen,* 733 F.2d 1059 (3d Cir.1984).

plies to these transcripts. *Cf. Criden I,* 648 F.2d at 828 ("It would unduly narrow the right of access were it to be confined to evidence properly admitted, since the right is based on the public's interest in seeing and knowing the events which actually transpired.").

In so holding we do not suggest that the fact that requested materials are not in evidence can never be a *relevant* consideration; we hold only that the district court erred in treating it as a *dispositive* consideration. *Cf. In re Application of National Broadcasting Co.,* 653 F.2d 609, 614 (D.C.Cir.1981). Where proffered evidence is found inadmissible because it is unreliable, or because it is more prejudicial than probative, the dangers of broad dissemination may substantially outweigh any benefits. This is not such a case—the requested transcripts were deemed sufficiently reliable and helpful to be given to the jury. In these circumstances the fact that the transcripts are not in evidence carries little weight.

### 2. *Extraordinary Public Interest*

■ The district court distinguished *Criden I* on the basis that "while there is a legitimate public interest in the proceedings greater than that attendant to the usual criminal case, it does not rise to that interest surrounding Abscam." Bench Opinion at 7–8. Although the extraordinary public interest in Abscam was noted in *Criden I,* 648 F.2d at 822, we do not believe that the court intended that this should be an important factor in the balancing process. Estimates of a case's public significance will inevitably vary among segments of the community, not to mention from judge-to-judge. In any event, we do not find that the general public interest in these proceedings differs markedly from the public interest in the *Criden* proceedings.

In distinguishing *Criden I,* the district court noted three facts: that this, unlike *Criden,* is not a case of "national dimension;" that "elected members of Congress are not involved;" and that "the investiga-

tive techniques used by the Government are not extraordinary." Bench Opinion at 7. As we read *Criden I,* however, that decision was not influenced by any "national dimension" or because members of Congress were involved. Indeed, although other Abscam prosecutions did involve members of the House and Senate, and did cut across several jurisdictions, *Criden* involved only the prosecution in Philadelphia of three Philadelphia City Councilmen and a local attorney. And though the FBI investigation conducted here was perhaps not as elaborate as Abscam, we believe that there are other factors present here that make this case of at least equal importance to the public. The integrity and efficiency of the police are matters that hit very close to home for most citizens. In this case police officers—including some of the highest-ranking in the city—with frontline law enforcement responsibility are accused of racketeering, extortion, conspiracy, and obstruction of justice. The fact that it is the *federal* authorities prosecuting these local officials is also a matter of legitimate public concern. Finally, we note that this is a rare case where some former police officers are cooperating with the government and testifying against fellow officers. In sum, we believe that this is a case of extraordinary moment, and that the presumption in favor of access to trial materials is no weaker here than it was in *Criden I.*

### 3. *Effect on Subsequent Proceedings*

The most important factor the district court considered, as was also true in *Criden I,* was the effect that release of the requested materials would have on subsequent related proceedings, and in particular on the prospects for impanelling a fair and impartial jury for the trial of the eight remaining defendants. For us this issue—the impact on subsequent proceedings—is by far the most difficult aspect of this case. For here we are all, whether as counsel, district court, or appellate judges, merely forecasting the uncertain future. We are looking at an opaque crystal ball, attempting to make predictions when we can never

know what all the future variables will be as to how these tapes or transcripts will be used by various representatives of the media. It is even more difficult to forecast with certainty the *impact* of such additional publicity. Under some circumstances, these materials, if reprinted and rebroadcasted, may seem as stale and uninteresting as last week's bread; yet, in other circumstances the materials can be reworked to bring a heightened sense of consciousness and drama to some of the events in this case.

We said in *Criden I:*

Considerations of the effect of publicity on a jury are ordinarily matters on which the trial court's judgment is entitled to considerable deference by an appellate court. The trial court has already supervised the selection of one jury and any particular problems which the news coverage in this highly publicized matter created for the selection process would have come to the trial court's attention. Therefore, if the trial court had already experienced difficulty in jury selection, we would be faced with an actual rather than conjectural factor militating against release of the tapes for rebroadcast. However, the trial court's experience was the contrary.... Accordingly, the danger to defendants' fair trial rights on a possible retrial is not based on the trial court's experience in this case, but rather on its conjecture about possible future difficulties.

648 F.2d at 827. We concluded that the district court had given too little weight to the impact of skillfully conducted *voir dire* examination as an antidote for the effects of publicity. 648 F.2d at 828.

■ Here the district court encountered some difficulty in selecting the first jury. *Voir dire,* conducted by the court, took approximately four days. "A large proportion of the individuals questioned had been exposed to some type of publicity regarding this case and alleged police corruption.

A not insubstantial number of those individuals stated they would have difficulty being fair and impartial because of their exposure to pre-trial publicity." Bench Opinion at 9–10. Based on this experience, the district court concluded that the "enhanced publicity" that would result from release of the requested materials "is likely to make it impossible to obtain a fair and impartial jury" for the trial of the eight remaining defendants. Bench Opinion at 11.

The district court's concern for the fair trial rights of defendants in subsequent proceedings is clearly entitled to much weight, and its experience in selecting the first jury shows that publicity in this case may have been unusually pervasive. *Compare In re Application of National Broadcasting Co. (United States v. Myers),* 635 F.2d 945, 953 (2d Cir.1980) ("[A]bout half of those summoned for jury selection had no knowledge of Abscam, and only a handful had more than cursory knowledge."); *United States v. Haldeman,* 559 F.2d 31, 62 n. 37 (D.C.Cir.1976) (in banc) ("Most of the venire simply did not pay an inordinate amount of attention to Watergate."), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). On the basis of this record, however, we cannot accept the district court's conclusion that "enhanced" publicity *is likely to make it impossible* to impanel a fair and impartial jury for the upcoming trial if appellants' requests are granted.

The requested materials can hardly be said to contain the sort of lurid or inflammatory matter usually present in cases where publicity has been found to work a denial of fair trial rights. *See, e.g., Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The tapes have already been played in open court, and have been widely reported in the media.[8] None of the partic-

---

8. For example, we take notice that the following account of one recorded conversation appeared

in a leading Philadelphia newspaper while the first trial was in progress:

ipants in these conversations are defendants currently awaiting trial, and—with few isolated exceptions—the relevance of these recorded statements to the guilt or innocence of the remaining defendants is unclear.

Moreover, we find here a number of factors that we believe make this an even stronger case for releasing the requested materials than *Criden I.* There we reversed the district court for not permitting media representatives to copy the videotapes even though the trial judge had released transcripts to the press and public. In this case, with but one exception, the trial judge refused to release *any* of the transcripts to the press—even though the jury had been provided those transcripts.

> In the March 7 conversation played for the jury yesterday, Martin and Alvaro knew that the indictments were imminent and that Ricci, who had been a vice officer under Martin and Alvaro in the northwest police division, would be indicted. Ricci testified last week that he had handed Martin protection payoffs from gambling operations totaling $10,000 a month for seven months.
>
> On the tape, Martin asked Alvaro what he thought Ricci's legal fees would come to. "Joe, let's say, what could it cost, 50?" he asked Alvaro.
>
> "Yeah," the federal informant responded.
>
> "OK, so we'll have to raise $50,000, that's all," Martin replied. "I ain't gonna sit back and let the guy get it. If he's gonna go to bat for me, got to go all out for him. There's nothing I can do about it. ... It shouldn't be no problem, to be honest with you, in a year, to raise just perhaps 60, 70 thousand. ... I'm totally depending on him to keep his mouth shut."
>
> "I think you can count on him not to say anything," Alvaro said.
>
> "Well, you, he can count on me," Martin said. "It's going to be an upfront thing. That way you don't have to worry about trust."
>
> Ricci testified last week that, in February, March and April, Martin paid him a total of $2,000, and that Martin promised him $500 a week for his silence.
>
> Later in the conversation, according to Alvaro's testimony, Martin talked about the direction the federal investigation was taking. Martin specifically discussed a lucrative source of extortion money—"lead houses," establishments where numbers bets are placed. Alvaro said Martin had told him that he was reluctant to continue presiding over the extortion but that he felt compelled to, if only to generate money for Ricci.

Our examination of the transcripts in *Criden I* and the transcripts in this case reveal no basis to distinguish between the two in terms of either significance or "titilation". If it was appropriate to release the transcripts in *Criden I,* it was error to deny access in this case. Secondly, we must not forget that in *Criden* the tapes sought were videotapes and not merely audiotapes, as are involved in this case. In *Criden,* Judge John P. Fullam of the district court wrote:

> The first point to be emphasized, in attempting to achieve a correct exercise of the Court's discretion in this case, is the very great difference between videotape evidence and other forms of evidence. The hackneyed expression, "one

> "I have to, you know, take the chance, that's all," Martin said on the tape. "I hate doing it and I'm trying to eliminate it as much as possible. ...
>
> "What am I going to do, Joe?" the deputy police commissioner asked. "You know what I'm worried about? I'm worried about them lead houses. Sambor's [Police Commissioner Gregore Sambor] getting all kinds of rumors.... I've got so much [obscenity] on my mind. You know, thinking all the time, all the time.... How the hell are we going to get them bastards away from here? If they don't leave us alone, finish it up and get it over with, you know, this could go one for four [obscenity] years ... You know, I feel so helpless. How do you stop this [obscenity] thing? Got any ideas?"
>
> "You don't, Jim," Alvaro said. "There's nothing you can do. No way you can stop it."
>
> Alvaro then suggested a crackdown on numbers operations for appearances' sake, saying the Major Investigations Division must have other sources of extortion money.
>
> "Jim, that can't be the only source," he said.
>
> "It isn't, but it's gonna create a lot of hollering and screaming," Martin replied. "You ever tell a guy that was making $100,000 a month to stop?"
>
> A few minutes later on the tape, Martin mused about the possibility that he could have become police commissioner.
>
> "I'm a little sorry I didn't take that number-one job when I had the shot."
>
> "Why?" Alvaro asked.
>
> "See, I could control what's happening....
>
> I would have said [obscenity] you, you know." Philadelphia Inquirer, July 25, 1984, at 6–A, cols. 1–3 (omissions and bracketed material in the original).

picture is worth a thousand words" fails to convey adequately the comparison between the impact of the televised portrayal of actual events upon the viewer of the videotape and that of the spoken or written word upon the listener or reader. *The viewer of videotape becomes virtually a participant in the events portrayed.* Eyewitness testimony is often dramatic and convincing, but its effectiveness and convincing power are almost negligible in comparison with a film or videotape of actual events. When the videotape shows a crime actually being committed, it simply leaves nothing more to be said.

This is all to the good, when the videotape is presented in evidence in the course of a trial: The jury is plainly entitled to the best and most reliable evidence available, in its quest for the truth. If the truth is shocking, if the evidence is powerfully convincing, so be it; the accused has no justifiable complaint.

But dissemination of powerfully convincing evidence beyond the confines of the trial arena can, in some circumstances, cause serious and irreparable harm, both to persons whose interests are entitled to protection, and to the judicial process itself.

*United States v. Criden,* 501 F.Supp. 854, 859–60 (E.D.Pa.1980), *rev'd,* 648 F.2d 814 (3d Cir.1981).

Nowhere in *Criden I* did we reject or dispute the above specific findings of the trial judge as to the potential for a greater prejudicial impact with the use of videotapes as compared to audiotapes or transcripts. Indeed, we found that "[r]eplication of the trial court experience may contribute to the public's understanding of the events which were the subject of the trial proceedings, and thereby enhance its 'comprehension of the functioning of the entire criminal justice system ...' " 648 F.2d at 824 (quoting *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 587, 96 S.Ct. 2791, 2816, 49 L.Ed.2d 683 (1976)). If these "public forum values," 648 F.2d at 822, served by release outweighed the potential prejudicial impact of the videotapes in *Criden I,* then—*a fortiorari*—the same values served by release of audiotapes and transcripts that replicate the trial court experience outweigh the lesser dangers created by their release.

■ Under these circumstances, we must deem the district court's conclusion highly speculative. Though, in our constitutional scheme, "[n]o right ranks higher than the right of the accused to a fair trial," *Press-Enterprise Co. v. Superior Court,* — U.S. ——, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984), speculative threats to that right have never been sufficient to overcome either first amendment rights to attend and report on trials, *Richmond Newspapers v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Nebraska Press Assn., supra,* or the common law right of access to trial materials, *Criden I,* 648 F.2d at 826–828; *Myers,* 635 F.2d at 953.[9]

---

**9.** The dissent seeks to distinguish *Criden I* on three bases. First, according to the dissent, the possibility of a subsequent trial in *Criden I* was remote and therefore militated against a denial of access, whereas here we have "the actuality of a trial already scheduled to begin shortly." *Dissent* at 975. We, however, do not read *Criden I* as treating this uncertainty as a critical factor. Rather, we said "there remains the possibility that Schwartz and Jannotti may have to be tried again in this district, and the effect of rebroadcast of the audio and videotapes on a possible future jury cannot be summarily dismissed." 648 F.2d at 827.

Similarly, we find unpersuasive the dissent's second suggested distinction: that the district

judge in this case, because of the difficulties in selecting the first jury, was better situated to predict the effects of "enhanced publicity" than was the trial judge in *Criden.* We do not see how the trial judge in *Criden* had any less of an opportunity to experience "the atmosphere of the courtroom and the demeanor of the jurors, prospective jurors, and witnesses...." *Dissent* at 976.

Finally, the dissent distinguishes *Criden I* on the ground that "here the district court did not deny access but merely postponed it." *Dissent* at 976. Far from distinguishing *Criden I,* this appears to repudiate our statement that there are "certain practical considerations that must be taken into account before finding that the possible effect of such publicity in a possible

When rights such as these come in conflict, courts must maintain a delicate balance that will adequately preserve the protection afforded by the one without unduly impinging upon the freedom preserved by the other. The trial court bears the primary responsibility for striking the proper balance, and "must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard,* 384 U.S. at 362, 86 S.Ct. at 1522. In this regard we have stated our belief that "the appropriate course to follow when the spectre of prejudicial publicity is raised is not automatically to deny access but to rely primarily on the curative device of voir dire examination ...." *Criden I,* 648 F.2d at 827.

Since the inception of our criminal justice system, courts have acknowledged the utility of skillfully conducted *voir dire* as a means of ascertaining a prospective juror's impartiality. Early in our history, Chief Justice Marshall wrote:

> Were it possible to obtain a jury without any prepossessions whatever respecting the guilt or innocence of the accused, it would be extremely desirable to obtain such a jury; but this is perhaps impossible, and therefore will not be required. The opinion which has been avowed by the court is, that light impressions which may fairly be supposed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony, and resist its force, do constitute a sufficient objection to him. Those who try the impartiality of a juror ought to test him by this rule.

*United States v. Burr,* 25 F.Cas. 49, 50–51 (C.C.Va.1807) (No. 14, 692g). This "testing" by *voir dire* remains a preferred and effective means of determining a juror's impartiality and assuring the accused of a fair trial.

The district court's patient and careful examination of potential jurors in this case is an excellent example of the power of *voir dire* to screen out persons who may not be impartial. And though we fully appreciate the difficulties this delicate task presents, we also note that the four days consumed by *voir dire* in this case is by no means extraordinary for a highly publicized criminal case. *Compare Press-Enterprise Co.,* —— U.S. at ——, 104 S.Ct. at 824 (*voir dire* in underlying criminal case consumed more than six weeks); *Irvin,* 366 U.S. at 720, 81 S.Ct. at 1641 (four weeks); *People v. Manson,* 71 Cal.App.3d 1, 139 Cal.Rptr. 275, 288 (Dist.Ct.App.1977) (24 days), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978). Conversely, in many cases surrounded by pervasive multimedia publicity, juries have been selected relatively quickly. Thus, even after film of the President of the United States being shot, and his alleged assailant being apprehended, was widely disseminated in the media, a jury for the attempted murder trial was selected in just five days. *See* N.Y. *Times,* May 4, 1982, at A22, col. 1 (trial of John W. Hinckley, Jr.). In the Watergate conspiracy case, after more than a year of sensational revelations in the media, a jury was selected after eight days of *voir dire* examination. *Haldeman,* 559 F.2d at 65.

Though we recognize the prospect that certain types of additional publicity may make *voir dire* somewhat more difficult in the upcoming trial, we cannot conclude that such publicity "is likely to make it impossible to obtain a fair and impartial jury" under the supervision of the thoughtful and sensitive trial judge. In all due respect, we think that the trial judge was far too modest in evaluating his proven skill to preside over effective *voir dire* proceed-

retrial warrants denial of access to evidence already introduced. Effectively, this would result in denial of the right to copy at a time when the issues remained a matter of public interest.

Thus the educational and informational value of public observation of the evidence would never be available at a meaningful time." 648 F.2d at 827.

ings that would impanel a jury and assure a fair trial to all of the parties.

## CONCLUSION

For the reasons set forth above, we will reverse the judgment of the district court and remand for proceedings consistent with this opinion.

SLOVITER, Circuit Judge, dissenting.

My difference with the majority is not on the legal principles to be applied when representatives of the press seek access to tapes admitted into evidence and other material presented to the jury. We agree that the applicable principles are those articulated in *United States v. Criden (Criden I)*, 648 F.2d 814 (3d Cir.1981). Instead, my principal difference with the majority lies with the standards by which we override the district court's exercise of its discretion, an important jurisprudential issue that continually confronts appellate courts.

It is, of course, conceded that the question of access to evidence is committed to the discretion of the trial court. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 599, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978); *Criden I*, 648 F.2d at 817. In reviewing the trial court's exercise of its discretion, we must determine whether it considered the relevant factors and gave them appropriate weight. *Id.* at 819. We must also, however, keep in mind "why that category or type of decision is committed to the trial court's discretion in the first instance," *id.* at 817, since such an analysis informs the scope of review.

In this case, the trial court, as did the trial court in *Criden I*, clearly and succinctly expressed the basis for its decision denying release. The majority reads the decision of the trial court as based on three factors, but I believe we must accept the judge's own statement that one factor, the rights of the defendants in the succeeding trial, was determinative. Although the trial court did remark on the non-evidentiary nature of the tape transcripts and on the contrast between the national dimension of the Abscam investigation at issue in *Criden I* and the local dimension of the police corruption at issue here, I find nothing to indicate that the trial court treated either of these as dispositive. The trial court accepted this court's standard established in *Criden I* that there is a strong presumption in favor of access to the materials at issue; it also recognized that "like *Criden*, this case is one of considerable public interest" and that "there is a legitimate public interest in the proceedings greater than that attendant to the usual criminal case."

The trial court was explicit with regard to the one reason for denying access to the requested material at this time. It stated: "*The* factor on which I rely to deny the petitioners' request is that of the defendants' right to a fair trial." (emphasis added). The court stated that the trial of the remaining eight defendants named in the same indictment was scheduled to begin on September 5, 1984, and that "[t]he effect of broadcast of the audiotapes on the second trial scheduled to begin six weeks from today must be considered." The court detailed the reason for its concern:

This case is one of considerable public interest and has been the subject of daily reports in area newspapers and on local television and radio since trial began. Members of the press attend the proceedings each day. The Philadelphia Inquirer began a four-part series on police corruption one week prior to the start of this trial. While it does not directly involve this case, it contains references to it and has placed the topic of police corruption in the public eye. Several of the individuals specifically named in the articles are unindicted co-conspirators in this case. Members of the FOP instituted a demonstration in front of the Inquirer building to voice their objections to the graphics used in connection with the story—a Philadelphia police badge with a dollar sign on it—thus resulting in more publicity the week prior to trial.

As a result of the pre-trial publicity in this case, it was necessary to question prospective jurors individually. *Voir dire,* which I conducted, took approxi-

mately four days. A large proportion of the individuals questioned had been exposed to some type of publicity regarding this case and alleged police corruption. A not insubstantial number of those individuals stated they would have difficulty being fair and impartial because of their exposure to pre-trial publicity. Others were released despite their statements that they could be impartial because I was concerned about their ability to be fair in the light of other statements they made regarding what they had read or heard.

\* \* \* \* \* \*

The second trial has been scheduled for many months and I am concerned about the rights of those defendants and the interest of the public in both a speedy and a fair trial. I believe that it would contravene the rights of the defendants and the public if a further continuance of this second trial is necessitated by publicity regarding the first trial.

The court concluded, "I believe that I must prohibit disclosure of the tapes and transcripts in order to enable the remaining defendants to obtain a fair trial."

The decision before us is whether the district court abused its discretion in so ruling. In *Criden I*, we held that where a decision committed to the discretion of the trial court "depends on first-hand observation or direct contact with the litigation", the trial court has "a superior vantage point which an appellate court cannot replicate" and therefore "[t]he trial court's decision ... merits a high degree of insulation from appellate revision." 648 F.2d at 817–18. We also held that a decision by the trial court with regard to access to materials that is based on the effect of publicity on the jury is the type of discretionary ruling entitled to a high degree of insulation from appellate review. Thus, we stated,

> Considerations of the effect of publicity on a jury are ordinarily matters on which the trial court's judgment is entitled to considerable deference by an appellate court. The trial court has already

supervised the selection of one jury and any particular problems which the news coverage in this highly publicized matter created for the selection process would have come to the trial court's attention. Therefore, if the trial court had already experienced difficulty in jury selection, we would be faced with an actual rather than conjectural factor militating against release of the tapes for rebroadcast.

*Id.* at 827. This is patently the situation here.

Although appellants argue before us that this case is indistinguishable from *Criden I*, I agree with the district court that this case presents considerably different factual circumstances in several significant respects. In the first place, here we are dealing not with a hypothetical trial, as in *Criden I*, but with an actual trial of other defendants on similar charges, now scheduled to begin November 5. In *Criden I*, we pointed out that it was unlikely that there would be a trial of any other defendants in this district, since the government had already filed unopposed motions seeking dismissal of the remaining defendants. 648 F.2d at 826. Thus, the only possible trial was the conjectural one of retrial in the event of a reversal on appeal. Although we could not exclude the "possibility" of a retrial, we considered the remoteness of this possibility as weighing against denial of access, *id.* at 827. *Accord In re National Broadcasting Co. (United States v. Jenrette),* 653 F.2d 609, 616 (D.C.Cir. 1981); *In re National Broadcasting Co. (United States v. Myers),* 635 F.2d 945, 954 (2d Cir.1980). *See also United States v. Mouzin,* 559 F.Supp. 463, 468 (C.D.Cal. 1983). In contrast, in this case the court is not dealing with a second trial as a mere possibility which may occur sometime after appellate review, but with the actuality of a trial already scheduled to begin shortly. In fact, the court's decision to postpone the second trial from September 5 to November 5, 1984 was made because of the court's concern about the effect of publicity on the jury selection process. Philadelphia Inquirer, Aug. 24, 1984.

In the second place, unlike *Criden I* where the district court had found virtually no difficulty in empanelling a jury, *see* 648 F.2d at 827, in this case the court had already encountered such difficulty in the first trial. Although a four-day *voir dire* does not indicate insurmountable difficulties in selecting a jury, it is important to recognize, as did the district court, that the enhanced publicity as a result of the first trial is likely to make the court's task in empanelling a jury for the second trial more difficult. I agree with the majority that Judge Huyett is a "thoughtful and sensitive trial judge" with "proven skill to preside over effective *voir dire* proceedings", but our confidence that he can overcome the difficulty does not demonstrate that he abused his discretion in evaluating the likelihood of difficulty of securing a jury untainted by pretrial publicity. *See United States v. Edwards*, 672 F.2d 1289, 1296 (7th Cir.1982).

I do not understand the majority to hold that the effect of releasing the requested material on jury selection is not a relevant factor to be considered in determining whether to give the press immediate access to the materials. Nor do I understand it to be saying that evaluation of this factor is not within the special competence of the trial court. Thus, this case differs from *Criden I* where "the decision whether to release the tapes was not dependent in the main on particular observations of the trial court." 648 F.2d at 818. While we, as appellate judges, may read the *voir dire* record to see if any problems of unusual difficulty were encountered, the trial judge who experienced the atmosphere of the courtroom and the demeanor of the jurors, prospective jurors, and witnesses is in a far better position to assess the effect of publicity on the trial proceedings. *See Patton v. Yount*, —— U.S. ——, 104 S.Ct. 2885, 2892–93, 81 L.Ed.2d 847 (1984). For similar reasons, other courts reviewing decisions of trial courts that denied the press access to requested materials have also accorded deference to the trial court's concern about the effect of publicity on the defendant's right to a fair trial. *See, e.g.,*

*United States v. Edwards*, 672 F.2d at 1296; *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 431–34 (5th Cir.1981).

The final significant difference between this case and *Criden I* is that here the district court did not deny access but merely postponed it. As the district court stated: "I will not prohibit the disclosure entirely, but will prohibit disclosure until after the tapes are played at the second trial. If the Government determines that it will not offer the recordings as evidence at the second trial, the transcripts may be released after the jury is impanelled in that case." The effect of the district court's ruling is that the tapes as well as the transcripts will be made available to the press no later than the date that they are played at the second trial, and possibly before. This ruling should provide ample vindication of the right of the public through the press to observe the trial proceedings "at a time when the issues remain[ ] a matter of public interest." *Criden I*, 648 F.2d at 827.

Significantly, the majority has not suggested that a decision on access to evidence or material submitted to the jury, hitherto discretionary, has now become one covered by a rule of general applicability. *See Criden I*, 648 F.2d at 818. Instead, it disagrees only with the result reached by the district court in balancing the relevant factors. However, the district court followed the framework established by *Criden I*, accepted the presumption favoring release, and considered the relevant factors. While I also might not have made the same decision as did the district court, I cannot say that the court's delicate balance between, on the one hand, concern about the effect of enhanced publicity on selection of a jury in a trial to begin shortly and, on the other hand, a temporary postponement of the press' access to materials which have already been played in open court and which have been the subject of full report in the press was so askew as to constitute an abuse of discretion. Therefore, I respectfully dissent.