### UNITED STATES of America,

v.

### Corey KEMP, et al.

### Criminal Action No. 04–370.

United States District Court,
E.D. Pennsylvania.

Jan. 21, 2005.

Christopher G. Furlong, Media, PA, Lloyd G. Parry, Michael J. McGovern, William R. Spade, Jr., Philadelphia, PA, for Corey Kemp.

Kevin H. Marino, Newark, NJ, for Glenn K. Holck.

Lawrence S. Lustberg, Newark, NJ, for Stephen M. Umbrell.

Anthony T. Chambers, Detroit, MI, Lewis Myers, Jr., Chicago, IL, Nathaniel E. Jones, Jr., Baltimore, MD, for Lavan Hawkins.

Nino V. Tinari, Philadelphia, PA, for Janice Renee Knight.

Catherine M. Recker, Lisa A. Mathewson, Philadelphia, PA, for Charles Lecroy.

Thomas H. Suddath, Jr., Lathrop B. Nelson, III, Philadelphia, PA, for Anthony C. Snell.

Jeffrey M. Lindy, Joel Harvey Slomsky, Philadelphia, PA, for Francis D. McCracken.

Joseph P. Grimes, Philadelphia, PA, for Rhonda M. Anderson.

Michael A. Schwartz, Richard J. Zack, Robert A. Zauzmer, Catherine Votaw, Joseph F. Minni, William B. Carr, Jr., Joan L. Markman, Philadelphia, PA, for United States of America.

## MEMORANDUM

BAYLSON, District Judge.

The issue presented is whether the Court should vacate its July 23, 2004 protective order precluding disclosure of Title III materials and/or unseal the pre-trial motions of Defendants Glenn Holck and Stephen Umbrell, which include as exhibits, numerous transcripts of Title III intercepted communications and/or grand jury materials.

### A. Background

On June 29, 2004, the grand jury returned a 56-count indictment in this matter charging some of the 12 defendants with conspiracy to commit honest services mail and wire fraud, mail and wire fraud, and other defendants with making false statements to the FBI, perjury, extortion, making false statements to obtain a loan, money laundering, and filing a false federal income tax return. To date, five defendants have entered guilty pleas, and one defendant has died.

The indictment focuses on allegations of a conspiracy centered around former Philadelphia City Treasurer, Defendant Corey Kemp, alleging that he agreed with several individuals to give them favored treatment in the awarding of city contracts in return for political contributions and personal gratuities. As such, the indictment makes serious charges concerning corruption in the highest levels of Philadelphia's city government.

Defense counsel requested discovery from the government, and the government responded by making available virtually the entirety of its investigatory materials, including Title III materials, grand jury transcripts, FBI statements, etc., as previously reviewed in detail in prior Memoranda by this Court. However, on July 23, 2004, the Court entered, at the government's request, a protective order, to which there was no objection, that restricted defense counsel from making any use of Title III materials other than for preparation for trial and for use at trial, and disclosure to the Defendants (Docket No. 58).

The trial of one Defendant in this case began on January 18, 2005; the trial of the remaining five Defendants is scheduled to begin on February 14, 2005.

On January 7, 2005, pursuant to a pretrial schedule, Defendant Holck and Umbrell filed, under seal, an omnibus pretrial motion, which in part seeks a court ruling that certain evidence which the government intends to use at trial should be excluded on various grounds.

## B. Parties' Contentions

### 1. Philadelphia Newspapers, Inc.

On January 10, 2005, Intervenor Philadelphia Newspapers, Inc. ("PNI") filed a motion seeking to vacate the July 23, 2004 protective order issued by this Court governing Title III materials. PNI argued that there is a First Amendment and common law right of public access to those materials and requested that the Court lift all sealing requirements and limitations on disclosure applicable to Title III materials, unseal any and all Title III materials previously filed under seal, allow PNI and the public generally to make copies of any transcripts filed with the Clerk or in Chambers, preclude the future filing of any such material under seal, and allow the parties and witnesses to disclose any and all of these materials to third parties, including PNI. (Motion at 1–2). This Court held oral argument on the motion January 13, 2005. At oral argument, PNI narrowed its request to documents filed with the Court in conjunction with pretrial proceedings, specifically, the sealed motions and accompanying exhibits filed by Defendants Holck and Umbrell on January 7, 2005, and documents submitted by the Government in response to that motion. (Tr. at 22) (PNI letter dated January 13, 2005 at 1).

### 2. Government

The Government agrees with PNI's view that there is a First Amendment right of access to pretrial motions filed in criminal proceedings. The Government points out that there is a distinction between Title III materials filed with the Court under seal in an ongoing investigation and transcripts that are submitted to the Court in connection with anticipation of a trial. (Tr. at 32). Thus, the Government does not oppose the unsealing of information filed in pretrial pleadings in connection with the upcoming trial. However, the Government does not agree that all the Title III materials filed under seal in connection to the investigation should be unsealed. Id.

### 3. Defendants Holck and Umbrell

Defendants Holck and Umbrell oppose PNI's motion to unseal the Title III materials and their pretrial motions. They argue that while there may be a right of access to any materials introduced into evidence at trial, there is no corresponding right of access to the wiretap intercepts at this pretrial stage because they are sealed and nonpublic pursuant to 18 U.S.C. §§ 2517 and 2518(8), as well as Fed. R.Crim.P. 6(e) (relating to grand jury materials). (Def. Response at 1, 7). Furthermore, Defendants argue that the documents should not be unsealed because

their Fourth Amendment right of privacy and Sixth Amendment right to a fair trial free of prejudicial pretrial publicity overrides any First Amendment right of access. *Id.* Accordingly, Defendants contend that only the admission of these materials into evidence at trial, if it occurs, would render them public. *Id.* at 7.

## C. *Summary of the Law*

### 1. *Statutory Provisions Concerning Title III Materials*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.*, allows judicially authorized interception of wire or oral communications. Once authorized by a federal judge of competent jurisdiction, these electronic recordings may not be released in their raw state. Rather, the statute requires that these wiretap interceptions be sealed and remain so except under narrowly defined circumstances, including "while giving testimony under oath." 18 U.S.C. § 2517. To this end, the statute imposes civil and criminal penalties for unauthorized disclosures. 18 U.S.C. § 2511(1). The statute does not explicitly authorize, prior to actual testimony under oath, the content of the communication may be revealed to anyone. "In sum, Title III is designed to protect the privacy of communications and the integrity of the courts." *In re Grand Jury*, 111 F.3d 1066, 1079 (3d Cir.1997).

Analyzing the nature of Title III materials, in the normal course of an investigation which leads to a criminal prosecution, these materials undergo a slow transformation, not unlike a caterpillar turning into a butterfly. In the initial stages of an investigation, the information is in the form of raw electronic recordings. The government must submit periodic summaries to the authorizing judge. After indictment, the recordings are transformed into transcripts submitted to defense counsel as part of pretrial discovery. The process culminates when selected recordings are played for a jury at trial. At the final stage, the materials have clearly entered the public realm. The more difficult question is where, along this continuum, do these materials become subject to the public access doctrine, so that they are available to the press and public.

There are very few cases discussing the pretrial release of Title III materials, and no case has been located by the Court or counsel on point to the pending issue. In general, courts have been reluctant to allow the pretrial release of these sensitive materials. In all cases, the courts inevitably refer back to the text of Title III to find the authority to release these materials. Specifically, Section 2515 provides that wiretap evidence may not be received in evidence in any trial, hearing or other proceeding before a federal or state governmental body if disclosure of the information would violate Title III. *See Certain Interested Individuals, John Does I–V, etc. v. Pulitzer Pub. Co.*, 895 F.2d 460, 464 (8th Cir.1990) (affirming district court's order concerning grand jury investigation in which no indictment had yet been filed, that required one affidavit to remain under seal and reversed the order redacting and disclosing search warrant materials as redacted).[1]

---

[1] Although the facts of this case are inapposite to the present situation in which an indictment has been filed and trial is approaching, the court's explanation for its ruling bears quoting:

The qualified first amendment right of access does not mean that these materials must automatically be disclosed. Nor does the qualified fourth amendment right of privacy, and the protections of Title III, mean that these materials must remain permanently sealed. We agree with the district court that what is required is a careful balancing of the public's interest in access against the individual's privacy interests, and we commend the district court for its

In addition, the cases agree that, subject only to the First Amendment right of access, any authority for release of Title III materials must be found in Title III. *See In re Motion to Unseal Elec. Surveillance Evidence,* 990 F.2d 1015 (8th Cir. 1993) (en banc), affirming order of district court denying private citizen's motion to unseal electronic surveillance evidence, and stating:

> Congress provided for very limited disclosure of any wiretap evidence that is obtained. It specifically required that recordings made under Title III be sealed by the authorizing judge, *see* 18 U.S.C. § 2518(8)(a)(1988), and provided for disclosure and use of the intercepted conversations under very specific circumstances. When addressing disclosure of the contents of a wiretap, the question is whether Title III specifically authorizes such disclosure, not whether Title III specifically prohibits the disclosure, for Title III prohibits all disclosures not authorized therein. *See United States v. Underhill,* 813 F.2d 105, 110 (6th Cir.), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987); *United States v. Dorfman,* 690 F.2d 1230, 1232 (7th Cir.1982).

990 F.2d at 1016.

In *In re Applications of Kansas City Star,* 666 F.2d 1168 (8th Cir.1981), the Eighth Circuit addressed the impact of the requirements of Title III on the disclosure of electronic surveillance. In *Kansas City Star,* an individual convicted of conspiracy to bribe a public official appealed the district court's grant of access to electronic surveillance documents being used as evidence by the government to the media. The Eighth Circuit held that 18 U.S.C. § 2518(8)(b) limits disclosure of sealed orders and applications for electronic surveillance to a showing of good cause, i.e. a need for disclosure. *Id.* at 1176. Concluding that the district court made no such finding, the Eighth Circuit vacated the judgment of the district court and remanded for entry of an order sealing the documents until there was good cause for their disclosure under Title III. *Id.* at 1176–77.[2]

*United States v. Gerena,* 869 F.2d 82, 85–86 (2d Cir., 1989) also provides this court with some guidance on the pretrial release of Title III materials. In *Gerena,* the defendants appealed the decision of the district court permitting the government to use previously sealed, intercepted conversations in publicly filed briefs and memoranda as long as the conversations did not involve persons who were not parties to or witnesses in the proceedings against defendants.

In deciding the issue of whether disclosure was proper, the Second Circuit relied heavily on its previous decisions in *In re New York Times Co.,* 828 F.2d 110, 116 (2d Cir.1987) [hereinafter *"New York Times I"*] (vacating and remanding orders of district court denying media access to pretrial motion papers containing Title III materials, holding that district court judge's rulings were not specific enough to justify closure) and *In re New York Times Co.,*

---

efforts to protect and accommodate the conflicting interests in access and privacy. 895 F.2d at 466.

**2.** This "good cause" requirement under Title III is different from the "good cause" showing, articulated in *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), required to limit a party's ability to disseminate information gained through pre-

trial civil discovery. In *In re Capital Cities/ABC, Inc.'s Application etc.,* 913 F.2d 89, 93 (3d Cir.1990), the Third Circuit stated that *United States v. Smith,* 776 F.2d 1104, 1111 (3d Cir.1985) (*"Smith I"*), made clear that the good cause standard does not control when a court is faced with a denial of access to criminal trial proceedings and records.

834 F.2d 1152 (2d Cir.1987) [hereinafter "*New York Times II*"] (vacating lower court's order and remanding because it appeared that lower court thought that first remand mandated disclosure of sealed material without further redaction if such further redaction resulted in a document that was almost meaningless). In *New York Times I* and *New York Times II,* the Second Circuit made clear that the district court should always engage in a balancing test to determine whether disclosure of Title III information is proper.

> Redaction is permissible ... if the district judge finds that important Title III privacy interests cannot otherwise be protected and such privacy interests outweigh the public's interest in access. We did not mean to imply in *New York Times I* that the privacy interests protected by Title III should necessarily take a back seat to a qualified First Amendment right of access. Indeed, our opinion made clear that Title III incorporates a very important right of privacy and that in applying the balancing test mandated by *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), the right of privacy incorporated in Title III "should weigh heavily in a court's balancing equation." *New York Times I,* 828 F.2d at 116.

*New York Times II,* 834 F.2d at 1154.

Against this background and even though it found a qualified First Amendment right of access to the briefs and memoranda at issue, the Second Circuit in *Gerena* recognized that such a finding "does not mean that Title III materials ... must automatically be disclosed." 869 F.2d 82, 85. Rather, the district court must conduct a balancing test and may seal or redact documents if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to

serve that interest.'" *Id.* at 85–86 (quoting *Press–Enterprise II,* 478 U.S. at 13–14, 106 S.Ct. 2735). Ultimately, the Second Circuit affirmed the order of the district court, holding that a qualified First Amendment right of access extended to the materials, but required the government to give defendants adequate notice before filing any briefs and memoranda containing unsuppressed material. *Id.* at 87.

In the present situation, the Court rejects the government's position, that Title III materials can be released merely because they have been attached to pretrial motions and/or designated for use at trial. The statutory provisions indicate that Title III materials are not subject to public release until and unless they are introduced into evidence. The government and PNI are invited to submit further authorities on their position regarding Title III materials. In this connection, the Court notes that the Protective Order entered on July 23, 2004, by its terms, only applied to defense counsel. Therefore, Defendants Holck and Umbrell, having filed a pretrial motion and supporting exhibits (largely excerpts from intercepted communications), under seal, acted in accordance with both the letter and spirit of that Protective Order. The government's response to that motion liberally quoted from Title III materials and also from grand jury materials. Some Title III materials are undoubtedly also grand jury materials. The Court in its Order dated January 19, 2005 suggested that a better practice for the government, rather than filing such materials without sealing them, would have been to apply to the Court for guidance on this point. The Court does not understand how the government expects defense counsel to be bound by the Protective Order of July 23, 2004, but that the government is not similarly bound.

The government and PNI are invited to submit further authorities on this point as well.[3]

## 2. *Grand Jury Materials*

The issue in this case, however, is further complicated by the argument of Defendants Holck and Umbrell that disclosure of the wiretap intercepts is also prohibited because it would reveal matters occurring before the grand jury, in violation of Federal Rule of Criminal Procedure 6(e). They argue that 6(e) material, like Title III material, is not subject to public disclosure because the information is intended to remain non-public unless and until it is used at trial. (Def. Response at 3). On January 20, 2004, the case agent, John Roberts, specifically testified that the grand jury investigation is "ongoing."

Defendants rely on *United States v. Smith*, 123 F.3d 140 (3d Cir.1997) [hereinafter *Smith III* ], which arose from a criminal prosecution in New Jersey where the defendants were convicted of involvement in a scheme arising out of state lottery kickbacks. The court found that there was no right of access to portions of briefs and transcripts of a hearing in which "matters occurring before the grand jury" were the subject of the brief and/or hearing. The Third Circuit held that because grand jury material was included in a sentencing memorandum, it was entitled to protection from disclosure, even if some of the grand jury material had previously been publically (and improperly) disclosed.

The secrecy of grand jury proceedings is well established in American law. *See U.S. v. Procter & Gamble Co.*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), which summarized the reasons for the policy of grand jury secrecy as follows:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Id.* at 682 n. 6, 78 S.Ct. 983 (quoting *United States v. Rose*, 215 F.2d 617, 628–29 (3d Cir.1954)); *see also Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211,

---

**3.** The Court is specifically using the term "inviting" in this Memorandum in terms of any party submitting additional authority. The Court does not want to put the burden of extensive research and writing on any of the parties because they are all, in good faith, working diligently to prepare for the February 14, 2005 trial. In view of the volume of intercepted communications and other documents made available during pretrial discovery, the task of preparing for this trial is challenging, as revealed in a number of pleadings in this case, including Defendants Holck and Umbrell's most recent Motion for Contin-

uance, and in various Memoranda of the Court. The Court notes in passing that the PNI Motion has been diversionary of the obligations of both the prosecution and the Defendants to use their time and energy in preparing for this trial. Nonetheless, the First Amendment issues presented are of extreme public importance and the Court has an obligation to rule promptly on these issues. However, PNI's counsel is not facing the burdens of trial preparation, and the Court therefore expects further briefing on the points raised in this Memorandum from PNI counsel.

218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979) ("The proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."). *See, also, United States v. Sells Engineering*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743, in which the court put restrictions on government criminal prosecutors disclosing grand jury materials to attorneys representing the government in civil proceedings. These principles of grand jury secrecy and certain limitations on secrecy are codified in Rule 6(e).[4]

In this case, grand jury materials, just as the Title III materials, have been disclosed to defense counsel as part of the pretrial discovery process. However, the government did not initially seek a protective order as to grand jury materials, as it did for Title III materials. Subsequently, there were some newspaper accounts of some grand jury materials and the government then moved for a protective order to prohibit defense counsel from making any disclosures of grand jury material to anyone, other than for the specific purpose of trial preparation. In the Memorandum dated September 22, 2004, this Court denied the government's motion. Nonetheless, the Court does not believe that any defense counsel has included grand jury material in any brief, but the government has made passing reference to grand jury material in various briefs it has filed.

As with the Title III material, the Court invites the government to articulate its view of exactly how grand jury material is subject to public disclosure by the government in advance of trial, in the absence of a Court Order under F.R.Crim. P. 6(e)(3)(E). The Court is aware that the government has taken a position that once the grand jury material is included in a motion filed with the Court, the secrecy aspect of Rule 6(e) no longer applies, but the government has not supplied any rule, statute or case support for this proposition.

### 3. *Case Law—Public Right of Access*

A review of the case law reveals that courts have consistently held that the presumption of openness in criminal proceedings extends beyond the trial to many other stages of a criminal case including preliminary hearings and post trial proceedings. *See Richmond Newspapers, Inc. et al v. Virginia et al*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (criminal trials); *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) [hereinafter *Press–Enterprise I* ] (selection of jurors); *Press–Enterprise Co. v. Superior Court of Cal.*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) [hereinafter *Press–Enterprise II* ] (preliminary hearings); *United States v. Simone*, 14 F.3d 833, 837 (3d Cir.1994) (post-trial proceedings); *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 164 (3d Cir.1993) (non-discovery pretrial motions); *United States v. Martin*, 746 F.2d 964, 968 (3d Cir.1984) (judicial records and documents including "transcripts, evidence, pleadings and other materials submitted by litigants"); *United States v. Criden*, 675 F.2d 550, 556 (3d Cir.1982) (pretrial criminal proceedings including pretrial suppression, due process and entrapment hearings). However, this right of access (when it attaches) is not absolute. *Press–Enterprise II*, 478 U.S. at 9, 106 S.Ct. 2735.

In making these determinations whether criminal proceedings are open, the courts have, over time, developed two parallel theories of public access: 1) the First

---

4. *See generally,* Diamond, *Federal Grand Jury Practice and Procedure,* § 10.01 (2001). The author is now a member of this Court.

Amendment right of access to judicial proceedings; and 2) the common law right of access to judicial documents. Because there is no controlling Supreme Court or Third Circuit precedent addressing the specific issue currently before the Court, i.e., whether pre-trial motions containing Title III and grand jury materials should (or must) be sealed, "it appears clear that the issue should be analyzed within the framework of [these] two established doctrines." *U.S. v. Kushner*, 349 F.Supp.2d 892, 897, 2005 WL 77607, *2 (D.N.J. Jan. 12, 2005) (right of public access extended only to certain materials, but not all documents, submitted to court in connection with sentencing of defendant).[5]

### a. *First Amendment Right of Access to Judicial Proceedings*

In *Richmond Newspapers*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court recognized that the press and the public have a First Amendment Constitutional right to attend criminal trials. In that case, newspaper reporters sought review of a closure order issued by a Virginia trial court and denials of writs of mandamus and prohibition excluding the press and the public from a murder trial. The media contended that the right of the public and press to attend criminal trials was guaranteed under the United States Constitution. The Court concluded that, absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public. *Id.* at 573, 100 S.Ct. 2814. Accordingly, the Court reversed the closure order because the right of the press and the public to attend criminal trials was implicit in the guarantees of the United States Constitution. *Id.* at 580, 100 S.Ct. 2814. The Court based its holding on at least six societal interests:

1. Public access to criminal proceedings promotes informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system, serving an important "educative" interest;

2. Public access to criminal proceedings gives "the assurance that the proceedings were conducted fairly to all concerned" and promotes the public "perception of fairness." Public confidence in and respect for the judicial system are served only by permitting full public view of the proceedings;

3. Public access to criminal proceedings has a "significant community therapeutic value" because it provides an "outlet for community concern, hostility, and emotion;"

4. Public access to criminal proceedings serves as a check on corrupt practices by exposing the judicial

---

5. Courts have consistently held that the First Amendment standard of review is more stringent than the common-law standard. While the denial of a claimed right of access under the common law engenders review for abuse of discretion, constitutional access claims engender broader review. *See In re Capital Cities*, 913 F.2d 89 (3d Cir.1990), and *In re Providence Journal Co.*, 293 F.3d 1, 10–11 (1st Cir.2002):

A district court can abuse its discretion by ignoring a material factor that deserves significant weight, relying on an improper factor, or, even if it mulls only the proper mix of factors, by making a serious mistake in judgment. Since only the most compelling reasons can justify non-disclosure of judicial records that come within the scope of the common-law right of access, this review is more rigorous than garden-variety abuse of discretion review.

On the other hand, [in cases involving] constitutional access claims ... the presumption in favor of access can only be overcome by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. *Id.*

process to public scrutiny, thus discouraging decisions based on secret bias or partiality;

5. Public access to criminal proceedings enhances the performance of all involved; and

6. Public access to criminal proceedings discourages perjury.

*See id. generally; see also United States v. Criden, supra,* 675 F.2d at 556 (summarizing interests).

Six years later, in *Press–Enterprise II,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1, the Supreme Court expanded on *Richmond Newspapers* and developed a two-part test, known as the test of "experience and logic," for determining whether a particular proceeding is one in which the First Amendment right of access attaches.[6] "This test asks whether (1) experience and (2) logic favor public access." *In re Newark Morning Ledger, Co.,* 260 F.3d 217, 221 n. 6 (3d Cir.2001) (summarizing *Press–Enterprise II,* 478 U.S. at 8–9, 106 S.Ct. 2735).

> The "experience" prong of the test concerns "whether the place and process have historically been open to the press and general public." The "logic" inquiry concerns "whether public access plays a significant positive role in the functioning of the particular process in question."

*United States v. Simone,* 14 F.3d 833, 837 (3d Cir.1994) (internal citations omitted). In making the logic determination, courts look to the six societal interests articulated in *Richmond Newspapers.*[7] "If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access

attaches." *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. 2735.

■ However, even when a right of access attaches, it is not absolute. *Id.* (citing *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)). "Under certain circumstances the right of public access may be outweighed by countervailing principles." *Newark Morning Ledger,* 260 F.3d at 221; *see also United States v. Simone,* 14 F.3d 833, 840 (3d Cir.1994) (noting that First Amendment right of access is not absolute and trial court has power to close proceedings once it makes findings sufficient to justify closure). For example, the court in *Press–Enterprise II,* stated that "there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity." *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. 2735. "In such cases, the trial court must determine whether the situation is such that the rights of the accused override the qualified First Amendment right of access." *Id.*

> [The] presumption [of access] may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. 819. Further, the court must "in a timely manner state its reasons on the

---

**6.** This test was developed in connection with and has been applied to the First Amendment right of access, not to the common law right of access. PNI's submission, surprisingly, does not contain any reference to the experience and logic test as formulated by the Su-

preme Court. PNI is requested to explain why it has not even mentioned this doctrine and to comment on it in a supplemental brief.

**7.** *See supra* pages 625–26 (summarizing factors).

record for rejecting alternatives to closure." *Criden*, 675 F.2d at 561.

"The Supreme Court has not ruled on whether the First Amendment right of access to criminal proceedings extends to court documents as well. However, the Third Circuit has answered the question in the affirmative." *U.S. v. Kushner*, 349 F.Supp.2d at 897, 2005 WL 77607, *3. Specifically, the Third Circuit stated that "the analysis under *Richmond Newspapers* and *Press–Enterprise I & II* concerning access to judicial proceedings applies with equal force to the issue of access to judicial documents." *United States v. Smith*, 776 F.2d 1104, 1111–12 (3d Cir.1985). Most importantly,

> the Third Circuit's First Amendment jurisprudence in the public access realm appears to employ strictly the "experience and logic" test of *Press–Enterprise*. Moreover, it recognizes that interests of privacy and reputation can be compelling enough to overcome the constitutional right of access, a right which, when it attaches, is extremely difficult to surmount.

*U.S. v. Kushner*, 349 F.Supp.2d at 898, 2005 WL 77607, *3. The Third Circuit has further held that the trial court has a duty to create a balance between First Amendment rights to freedom of the press and the defendants' right to a fair trial. *See United States v. Martin*, 746 F.2d 964 (3d Cir.1984) (reversing and remanding order of district court denying media permission to copy audio tapes admitted into evidence). This necessarily gives the trial court a certain amount of discretion. *See Republic of Philippines v. Westinghouse*, 949 F.2d 653, 664 (3d Cir.1991) (concluding that "whether to release material claimed to be confidential is committed to the discretion of the district court").

In *Martin*, the Third Circuit held that the media was entitled to copy audio tapes admitted into evidence in a criminal trial. *Martin*, like the present case, involved multiple defendants and two sequential trials. In total, fifteen officers and former officers of the Philadelphia Police Department had been indicted. *Martin*, 746 F.2d at 966. The trial of seven defendants ended on August 10, 1984 with verdicts of guilty on all counts. *Id.* The trial of the eight remaining defendants was scheduled to begin on November 15, 1984. *Id.* In the interim, the Third Circuit addressed the dispute over the audiotapes and transcripts during the time period between the two trials, on October 19, 1984.

In *Martin*, the district court relied on three reasons for denying the media access to the audiotapes played to the jury in the first trial, and transcripts of the tapes:

> (1) the transcripts sought by appellants were not admitted into evidence;
>
> (2) the public interest in these proceedings is not as significant as the interest in Abscam; and
>
> (3) the "enhanced publicity" caused by release of the requested materials would likely make it impossible to impanel a fair and impartial jury for the trial of the eight remaining defendants.

*Id.* at 968. On appeal, the Third Circuit concluded that although the impact of the publicity on the subsequent proceedings was the most difficult aspect of the case, the district court gave too little weight to the "impact of skillfully conducted voir dire examination as an antidote for the effects of publicity." *Id.* at 970 (citing *Criden*, 648 F.2d at 828). Thus, the Third Circuit reversed and remanded the order of the district court, holding that the media was entitled to the audio tapes.

### b. *Common Law Right of Access to Judicial Records*

It is well-settled that there exists, in both criminal and civil cases, a common law public right of access to judicial

proceedings and records. *Littlejohn v. BIC Corporation,* 851 F.2d 673, 677–78 (3d Cir.1988). The public's right of access extends beyond simply the ability to attend open court proceedings. Rather, it envisions "a pervasive common law right 'to inspect and copy public records and documents, including judicial records and documents.'" *Leucadia, Inc. v. Applied Extrusion Tech., Inc.,* 998 F.2d 157, 161 (3d Cir.1993).

*Goldstein v. Forbes (In re Cendant Corp.),* 260 F.3d 183, 192 (3d Cir.2001).

■■■■ In *Kushner,* Judge Linares very recently summarized the history of the common law right of access to judicial records and the amount of discretion afforded the trial court in allowing public access.

The common law right to inspect and copy judicial records predates the Constitution and was formally recognized in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). It is rooted in many of the same principles that form the basis of the First Amendment right, including the need for accountability of the otherwise independent judiciary, the need of the public to have confidence in the effective administration of justice, and the need for civic debate and behavior to be informed if it is to have value. *United States v. Criden,* 648 F.2d 814, 820–21 (3d Cir.1981) (*"Criden I"*); *United States v. Amodeo,* 71 F.3d 1044, 1048 (2d Cir.1995). A qualified right of access attaches automatically to all judicial records, without a showing of any particularized need. *See Nixon,* 435 U.S. at 597–98, 98 S.Ct. 1306. What constitutes a "judicial record" hinges on "whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings." *In re Cendant Corp.,* 260 F.3d 183, 192 (3d Cir.2001).

Notwithstanding the "automatic" nature of this right of access, it is not absolute. This is so, because "[e]very court has supervisory power over its own records and files," and access to records can be properly denied "where court files might have become a vehicle for improper purposes"—for example, "to gratify private spite or promote public scandal." *Nixon,* 435 U.S. at 603, 98 S.Ct. 1306 (internal quotes and citations omitted). *Nixon* recognized that, while a comprehensive definition of the common law right is unavailable, it is universally accepted that "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 598–99, 98 S.Ct. 1306.

*U.S. v. Kushner,* 349 F.Supp.2d 892, 898–99, 2005 WL 77607, *3–4 (D.N.J.2005).

Against this background, "the common law right of access . . . becomes the 'next best' way to vindicate the public interest under the First Amendment. . . ." *Id.* "In this way, the common law and First Amendment rights interact, with the former filling gaps left open by the latter." *Id.* Thus, even if the First Amendment does not afford access to the motions in this case, the common law may recognize such a right. *See id.* at 903–06, 2005 WL 77607, *8–10.

However, like the First Amendment right of access, this common law right of access is not absolute. *See Nixon v. Warner Communications,* 435 U.S. 589, 597–8, 98 S.Ct. 1306, 55 L.Ed.2d 570 (approving general right to inspect and copy judicial records). Rather, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 599, 98 S.Ct. 1306. Courts applying this balancing test have limited public access to judicial records for a variety of reasons.

Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not used to gratify private spite or promote public scandal through the publication of the painful and sometimes disgusting details of a divorce case. Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, or as sources of business information that might harm a litigant's competitive standing.

*Id.* at 598, 98 S.Ct. 1306 (internal citations omitted).

### c. Court Approval Is Required for Pretrial Release *Of Title III and Grand Jury Materials*

■ It is clear from the above review of Title III and Rule 6 that no party in a criminal case, including the government, has the unilateral right to disclose in a brief, press release or otherwise, at least prior to the introduction into evidence at either a hearing or trial, intercepted communications or grand jury materials.

The Court rejects the position of PNI and the government that these materials, merely be being attached to a motion properly filed under seal, or being identified prior to trial as trial exhibits, automatically become subject to public access. That may be the general rule, but Title III and grand jury materials have their own rules.

From a review of the applicable law, the Court concludes that the government was under an obligation to file any memoranda containing these materials under seal, unless alternatively, the Court, upon request, had authorized public dissemination. Given the numerous court rulings upholding the right of access under the First Amendment and/or common law doctrines, it is highly likely such a request would be granted—subject to possible restrictions relating to timing, redaction of certain information for good cause shown, or exclusion of evidence ruled inadmissible.

There seems little reason to require such a formal motion at this time since the contents of the government's unsealed response to the pretrial motions has already been the subject of media reports, and the various parties' letter briefs have adequately framed the issue so that the Court may rule.

### d. Public Access to Pretrial Motions

■ At the outset, it is clear that in the realm of pretrial proceedings, there are no absolutes and the district court has some discretion to determine whether a right of public access exists and to what extent it is outweighed by countervailing interests. However, in the Third Circuit, the rulings are consistent that pretrial hearings are generally open to the public. *See Criden, Martin.* In this case, we are not concerned with pretrial hearings, but with pretrial motions, which attach as exhibits, Title III and grand jury materials provided to defense counsel as part of pretrial discovery. In addition, of particular relevance to the present case, some cases have held that some proceedings on motions to suppress can be filed under seal because if evidence has been seized illegally, the public has no right to it. *See e.g., In re Application of Herald Co.,* 734 F.2d 93 (2d Cir., 1984) (remanding case for district court judge to explain reasons he used for justifying courtroom closure in defendant's suppression hearing).[8] Generally, the ju-

---

**8.** Also relevant are *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17, *on remand,* 98 Wash.2d 226, 654 P.2d 673

dicial system is not served by making illegally seized or inadmissible evidence available to the public.[9] *See United States v. McVeigh,* 119 F.3d 806, 813 (10th Cir.1997) (holding that the right of access to suppression hearings and accompanying motions does not extend to evidence actually ruled inadmissible). However, a court should recognize and consider, in balancing the various interests, the societal value of allowing even inadmissible evidence to be made public in a public corruption case. The issue may be one of timing.

The Third Circuit has addressed the right of public access to pretrial motions in a different context. For example, in *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.,* the Third Circuit held that under the common law there is a presumptive right of public access to pretrial motions of a non-discovery nature, whether preliminary or dispositive, and the material filed in connection therewith. 998 F.2d 157, 164 (3d Cir.1993).

In *Republic of the Philippines v. Westinghouse,* the Third Circuit refused to stay, pending appeal, an order by the district court to unseal the summary judgment record. 949 F.2d 653 (3d Cir.1991). In *Republic of Philippines,* the Third Circuit recognized that the First Amendment, independent of the common law, protects the public's right of access to the records of civil proceedings, but limited its analysis

to the common law. *Id.* at 659. The Court also recognized the strong common law presumption in favor of public access, but stated it "must be balanced against the factors militating against access." *Id.* at 662. After considering the relevant countervailing interests, the Court concluded that they were insufficient to overcome the presumption of access. *Id.* at 663. Thus, there was a right of public access to the summary judgment record.

In a decision very relevant to the present case, *United States v. McVeigh,* 119 F.3d 806 (10th Cir.1997), the Tenth Circuit considered the media's challenge to the district court's sealing of certain documents in the infamous "Oklahoma bombing" case. The challenge came after McVeigh was convicted and sentenced to death, but before McVeigh's co-defendant, Terry Nichols, went to trial. *Id.* at 808. The media asserted both a common law and a First Amendment right to access the documents. *Id.* at 811. In *McVeigh,* the court recognized that court documents are covered by a common law right of access. *Id.* The court noted:

> Under that doctrine, judicial documents are presumptively available to the public, but may be sealed if the right to access is outweighed by the interests favoring nondisclosure. *Nixon,* 435 U.S. at 602, 98 S.Ct. 1306. Challenges to closure decisions based

---

(1982), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984) (concluding that the First Amendment does not require open access to discovery materials); *Gannett v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (holding that the press and public can be constitutionally excluded from a pretrial suppression hearing); *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (no constitutional right of access to copy and disseminate judicial records or evidence used at trial); *International Products Corp. v. Koons,* 325 F.2d 403, 407–408 (2d Cir.1963) (First Amendment does not affect trial court's right

to restrain dissemination of pretrial discovery material); *Tavoulareas v. Washington Post Co.,* 724 F.2d 1010, 1016 (D.C.Cir., 1984) *reh'g en banc,* opinion vacated, 737 F.2d 1170 (D.C.Cir.1984) ("Though the lines delimiting the common law right of access are vague, we believe they do not include documents not used at trial.").

9. The court agrees with the government that there is no allegation in this case that any evidence was illegally seized, however, Defendants Holck and Umbrell argue that some of the evidence is inadmissible.

on the common law right of access are reviewed for abuse of discretion.

*Id.* The Tenth Circuit distinguished *Press–Enterprise II* because it involved a closed proceeding and not sealed documents. *Id.* The court also noted that:

> both the common law and First Amendment standards ultimately involve a balancing test, and the First Amendment right of access receives more protection than the common law right. Thus, if we find the district court orders satisfy the First Amendment standard, as we do, we will necessarily find that the orders satisfy the common law standard as well. Accordingly, for the purposes of this opinion, we assume without deciding that access to judicial documents is governed by the analysis articulated in *Press Enterprise II.*

*Id.* In its analysis, the *McVeigh* court first noted that suppression motions have historically been open to inspection by the press and the public. *Id.* at 813. However, the right of access to suppression hearings and accompanying motions does not extend to the evidence actually ruled inadmissible in such a hearing. *Id.* The court concluded that "neither tradition nor logic supports public access to inadmissible evidence." *Id.*

> Access to inadmissible evidence is not necessary to understand the suppression hearing, so long as the public is able to understand the circumstances that gave rise to the decision to suppress. Moreover, suppressed evidence, by definition, will not be admissible at trial, and thus press access to such evidence will not play a significant positive role in the functioning of the criminal process, as that evidence is simply irrelevant to the process. On the contrary, disclosure of such evidence would play a negative role in the functioning of the criminal pro-

cess, by exposing the public generally, as well as potential jurors, to incriminating evidence that the law has determined may not be used to support a conviction.

> Here, the district court has only sealed those portions of the motion and exhibits that contain materials, or excerpts from materials, ruled inadmissible in the McVeigh trial. Sealing these materials was necessary to protect the integrity of the order that the statements at issue constituted inadmissible hearsay or were otherwise inadmissible. Access to the redacted information is not needed for a full understanding of the court's decision on the motion to suppress, as the suppression hearing itself was open, and the court order provided a detailed outline of the reasons for its conclusion that the statements were inadmissible in the McVeigh trial.

*Id.*

After completing its analysis, the Tenth Circuit concluded that the "district court made adequate findings to support its [sealing] orders, and that it narrowly tailored those orders to the compelling interests at stake." *Id.* at 814.

### D. *Analysis*

■ Similarly, in this case, the court's decision hinges on the application of the two parallel doctrines of public access, and ultimately rests on the court's balancing public access against the countervailing interests cited by Defendants.

In considering the First Amendment doctrine, the transcripts of intercepted communications under Title III fail the "experience" prong as stated in *Press–Enterprise II.* First, pretrial motions that include Title III materials are statutorily precluded from disclosure to the public prior to trial. Second, no party has made

any showing that this type of evidence was customarily available to the public. Of course, no such showing could possibly be made because telephone conversations were only subject to interception following the invention of the telephone, and even thereafter, wiretapping is a fairly recent law enforcement phenomenon, and Congress regulated it in the passage of Title III in 1968. Therefore, neither the Court nor any party could assert that Title III materials were, in our legal experience, available to the public.

As stated above, the "experience" prong of the test concerns "whether the place and process have historically been open to the press and general public." *United States v. Simone*, 14 F.3d 833, 837 (3d Cir.1994). Under this prong, grand jury proceedings have traditionally been closed to the public. *Press Enterprise II*, 478 U.S. at 10, 106 S.Ct. 2735. Moreover, Rules 6(e)(5) and 6(e)(6) require a court to seal any papers or hearings "affecting" or "relating to" grand jury proceedings, which includes any proceedings that would disclose secret grand jury material. *United States v. Smith, supra,* 123 F.3d at 143. Case law also supports limiting public access until a court can decide which documents contain grand jury material. *See Newark Morning Ledger*, 260 F.3d 217 (affirming district court's determination that proceedings and filing were to be sealed pending determinations of what was secret). Thus, grand jury materials also fail the "experience" prong.

However, this conclusion does not fully solve the riddle because the First Amendment doctrine is founded in our Constitution, which must of necessity, trump a rule or statutory provision. However, under the Supreme Court's rule in *Press Enterprise II*, the above analysis is part of the constitutional analysis.

Considering the second "logic" prong, the Court must consider the societal interests stated in *Richmond Newspapers,* summarized above. Without question, consideration of these factors overwhelmingly supports public access to the material, particularly in a case involving public corruption.

A dominant chord running through the appellate decisions reviewed above is that courts must make public corruption proceedings open to public scrutiny. Official corruption is a malignant cancer on the body politic, for which prosecution and publicity are strong cures. Prosecution of public corruption cases must be highly transparent so that the public will be aware of the governmental transactions at issue, which will allow members of the public to express opinions and exercise their right to petition and vote based on conclusions reached from the facts in the public record, regardless of the guilt or innocence of a particular defendant. However, the cases hold that an additional factor must be considered, and that is fairness to those defendants on trial or awaiting trial.

Even if a qualified First Amendment right of access to the motion papers and Title III materials attached thereto exists, it does not automatically follow that the information must be unsealed. *See United States v. Gerena,* 869 F.2d 82, 85–86 (2d Cir.1989) (affirming order of district court permitting government to use previously sealed, intercepted materials). The First Amendment right of access to criminal proceedings is not absolute.

> Proceedings may be closed and, by analogy, documents may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest. Such findings may be entered under seal, if appropriate.

*New York Times II,* 828 F.2d at 116 (internal citations omitted). Thus, even if this court finds that a qualified First Amendment right of access exists, the analysis does not end. The court must conclude, after balancing all the factors, that disclosure is appropriate.

### E. *Consideration of Specific Factors*

1. At this time, one Defendant, Denis Carlson, is on trial for making false statements to the FBI. The Court has had experience in jury selection for Denis Carlson which is of relevance as to the impact of pretrial publicity on the prospects of a fair trial for the remaining defendants charged with conspiracy, including Holck and Umbrell. In *Martin,* 746 F.2d 964 (3d Cir.1984), also a case in which the ruling and appeal on public access came in between two trials, the Third Circuit noted that the trial court's experience in jury selection was an important factor in determining release of material to the public. *Id.* at 969.

In the present Carlson prosecution, the Court released all the government's exhibits to the public at the start of the trial. Some intercepted communications have been introduced into evidence, and the media has carried accounts, from government filings, of the contents of other intercepted communications, many of which will not be introduced in the Carlson trial.[10] Although the Carlson jury has been strongly and frequently instructed not to read or listen to media accounts of the government's investigation or prosecution, there is always the possibility that a juror will, either carelessly or inadvertently, read or hear such accounts and may be influenced as a result of that exposure. Therefore,

the Court considers it highly prudent, and in the exercise of the discretion allowed under the cases reviewed above, to preclude the government and Defendants from making any non-court release of Title III or grand jury materials while the Carlson trial is pending.

2. Concerning the issue of whether any further pretrial release of intercepted communications should be made prior to the conspiracy trial scheduled to start on February 14, 2005, the Court notes its experience in the voir dire of the venire gathered for the Carlson trial, consisting of 78 individuals. In general questions to the venire, an overwhelming majority indicated that they had read or heard something about the government's investigation. Approximately one-half of the venire were subject to individual voir dire before counsel began the jury selection process. Of the members of the venire questioned individually, only three indicated that they had reached opinions as a result of reading or hearing about the government's investigations, but those opinions were limited to the general topic of public corruption and/or specifically, alleged corruption within the city of Philadelphia. No potential juror had any opinion as to the guilt or innocence of Carlson or any other specific individual. Except for the three jurors who had an opinion about corruption, who were excused, all the other jurors said that their information about the investigation/prosecution was limited and superficial and they could not recall any specific details.

3. The Court's experience in the selection of the Carlson jury must lead to a conclusion that the pretrial publicity that

---

**10.** See the Court Exhibits 1 and 2 marked at the hearing on January 13, 2005, and also articles from the Philadelphia Inquirer carried on January 17, 2005 and January 19, 2005, detailing from government exhibits filings, additional contents of intercepted communications, which will be marked Court Exhibits 3 and 4 respectively, and placed in the record. A column in the January 21, 2005 *Inquirer,* to be marked Court Exhibit 5, refers to Carlson as a "liar," thus prejudging the issue before the jury.

has taken place so far, as illustrated in part by Court Exhibits 1–4, is unlikely to impact a fair trial for the five Defendants facing conspiracy charges, including Holck and Umbrell. The Court believes that it can, and will, in the jury selection of the upcoming trial, give counsel ample latitude to question jurors as to their exposure to media accounts of the government's investigation/prosecution, and will exclude jurors who have formed opinions which may interfere with their ability to be fair and impartial jurors, and may in addition, grant additional peremptory challenges to Defendants.

All in all, the Court concludes that the pretrial release of some Title III and grand jury materials at an appropriate time will not interfere with the right of the Defendants to a fair and impartial jury.

4. In terms of the orderly progression of this case and the requirement that the Court make specific findings relating to the public access issue, the pretrial motion of Holck and Umbrell, and the government's response, were filed pursuant to a previously set briefing schedule, including a hearing on these motions for January 24, 2005.

 As noted above, an important segment of the motion relates to the contentions of Holck and Umbrell that certain government exhibits, including but not limited to certain intercepted communications, are inadmissible. As held in *McVeigh*, cited above, inadmissible evidence is not necessarily subject to pretrial disclosure. Whether that rule should apply in a public corruption case is an important issue. Some material may be subject to redaction. However, the Court believes that it should have the hearing and decide the pretrial motions of Holck and Umbrell (and any other pretrial motions that may have been filed by other Defendants in the conspiracy trial) before making a final ruling on this disclosure issue.

5. The Court concludes that the case law requires that at least most of the government's exhibits in the conspiracy trial should be released to the public prior to the actual start of the trial. Given the huge volume of those exhibits, it is unrealistic to expect that accurate and fair reporting, which is very much in the public interest, could be accomplished by precluding media access to these exhibits until the conspiracy trial has started, or as Defendants request, they are introduced into evidence. As the Third Circuit has noted, the Court cannot evade its duty to allow public access merely because it faces the prospect of a more lengthy or difficult voir dire of prospective jurors. *See Martin.* In resolving this conflict, the cases are clear that the Court must allow public access even at the risk of extending or expanding the voir dire process, including additional leeway for questions and/or peremptory challenges to defense counsel.

In the final analysis, whether the court finds a right of access under the First Amendment or the common law, this court must perform the balancing test mandated by Supreme Court and Third Circuit precedent. If the Court finds that privacy, fair trial interests or other countervailing interests cannot otherwise be protected and that these interests outweigh the public's interest in access, it should order redaction or sealing. In doing so, this court must supplement the above findings so that a reviewing court can determine whether the sealing or redaction order was properly entered. *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. 819. The Court cannot make this final decision until after the hearing on pretrial motions on January 24, 2005.

## F. *Conclusion*

The Court concludes, in applying the experience and logic test, that the docu-

ments which PNI seeks fail the experience test, but pass the logic test. As this case moves along a continuum towards trial, the timing and scheduling concerns expressed above warrant the Court in delaying a final ruling balancing its conclusions on the experience and logic test. Detailed review and argument of the Holck and Umbrell pretrial motions will further educate the Court, and perhaps counsel, on how to balance the Court's conclusions concerning experience and logic in reaching an ultimate decision. The Court at that time will also consider whether any relief is warranted under the common law public access doctrine, which would only apply to materials filed with the Court.

Defense counsel, faced with the Court's decision that release of at least some trial exhibits, such as those not challenged by the Holck and Umbrell pretrial motion, and perhaps other documents which the Court rules are admissible despite Holck and Umbrell's objection, will be made available to the media pretrial, may express their views as to the timing of this release at the January 24, 2005 hearing.

An appropriate Order follows.

### *PRETRIAL ORDER NO. 13*

AND NOW, this 21st day of January, 2005, for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED as follows:

1. The Motion of PNI, as modified at the hearing on January 13, 2005, for immediate unsealing of the exhibits to the Holck and Umbrell Omnibus Pretrial Motion is DENIED, at least until completion of the Carlson trial and decision on the Holck and Umbrell motion, which is scheduled for argument on January 24, 2005. The Court may unseal part of the brief at the hearing.

2. The requests of Holck and Umbrell that no Title III or grand jury materials be released until they are introduced into evidence is DENIED.

3. Pending further Order, counsel shall not make any non-court public disclosure of the Title III or grand jury materials.

4. Once the Carlson trial is completed and pretrial motions have been decided, which process will be expedited, the Court will make a further decision as to whether some or all of Title III materials and/or the grand jury materials, which are government trial exhibits, will be released prior to trial, in full, or redacted, and the timing thereof.

5. PNI is directed to file authorities on the points raised in the foregoing Memorandum within one (1) week. The other parties in this case may file briefs within one (1) week, but are under no obligation to do so.